THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTHUR VILLALOBOS, Defendant-Appellant.

First District (1st Division)   No. 61645

Opinion filed September 19, 1977.

John P. Coghlan, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Linda D. Woloshin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

After a bench trial, defendant Arthur Villalobos was convicted of murder and sentenced to 14 to 20 years. Defendant argues on appeal that he was not proved guilty beyond a reasonable doubt, he was prejudiced by various prejudicial trial errors, including the improper calling of a prosecution witness as a court's witness and the improper introduction of evidence of an unrelated offense. He also raises a constitutional issue regarding failure of the prosecution to advise him of information tending to negate his guilt.

We reverse.

We will first consider the sufficiency of the evidence to prove the guilt of defendant beyond a reasonable doubt. Certain of the facts are undisputed. On the evening of December 23, 1972, defendant and the victim were involved in a tavern brawl. Defendant was 5 ft. 6 in. tall and weighed about 155 pounds. Deceased was 6 ft. 1 in. tall and weighed from 215 to 220 pounds. At about 7 o'clock, an argument commenced between the parties which ended in a fist fight and a struggle on the floor.

The bartender threw some water on the combatants and defendant left the tavern. Defendant returned in about 20 minutes and another fight ensued. Death came to the deceased as a result of several stab wounds. Virtually every other factual element in the case is disputed.

Although six persons were present at the time, the single eyewitness called by the State was Richard Sobieraj. The only other eyewitnesses who testified were the defendant, Daniel Gonzales and James Stoner. Sobieraj testified on direct examination that when defendant initially entered the tavern he asked the deceased to arm wrestle with him. The deceased refused. The defendant struck the deceased. The first fight then commenced. The witness stated that 45 minutes after the first fight, defendant returned to the tavern. He quickly approached the deceased and gave him "a couple of karate blows." The witness later noticed that defendant was armed with a knife. He "didn't really notice anything" in the hands of deceased. He saw nothing in defendant's hand to his knowledge.

On cross-examination Sobieraj testified that during the time he was in the tavern he had from 6 to 8 beers and also a few shots of whiskey. He previously had "a few cans of beer." Shortly before defendant reentered the tavern, he heard deceased state that if defendant returned the deceased would "whip his butt." After defendant left, the deceased cleaned himself up and "started drinking" again. He also testified that he did not see defendant in possession of a knife during the second encounter until defendant and deceased were rolling on the floor. On this point the witness said rather cryptically, "When the struggle, you know, ensued then I didn't see him come in with nothing in his hand, no." He further testified on cross-examination that he believed there were broken bottles and glass on the floor after the killing.

At one point during the cross-examination of the witness, a recess was taken. Upon resumption, the State's Attorney advised the court that the witness had left the stand and spoken to other people in the corridor. The court ascertained that this fact was correct and that the witness had spoken to a man named Arthur Yzaguirre and to a brother of the defendant. Counsel for defendant stated that he was not going to call the defendant's brother to testify and that the name of the remaining witness appeared on the State's list of witnesses. Yzaguirre stated that the witness had asked him for a cigarette and did not discuss the case. The State's Attorney suggested that the only remedy was to preclude those persons who had spoken to the witness from testifying. Defense counsel then stated that he would suggest that this be done. The State made this suggestion in the form of a motion and counsel for defendant stated that he had no objection. The court then ruled that the brother of the defendant and Yzaguirre would not testify.

On redirect examination the witness testified that he could not swear that he saw a knife in the hand of defendant at any time but saw only a shiny object which glittered in the Christmas tree lights. He "assumed" it was a knife but did not see a knife. He could not see anything in the hands of the deceased.

The State's Attorney then requested that he have leave to examine the witness as a court's witness because of alleged changes in his testimony. In support of this request he read to the court sections of testimony by the witness allegedly given at a preliminary hearing held some one year and nine months prior to trial. Over objection by defendant, the court granted this motion and the State then proceeded to impeach the testimony of the witness by reading his previous testimony. The witness conceded that at the preliminary hearing he had testified that he saw a knife with a 5- or 6-inch blade in possession of defendant. He also testified that when he first saw the knife it was in defendant's hand.

Daniel Gonzales testified for defendant that he had first visited another tavern with defendant. They each had a drink for which defendant paid after he had taken his wallet from his back pocket. They then went to the tavern in question. The initial portion of the brawl commenced when deceased swung at the defendant after some preliminary conversation. After this fight, defendant was bleeding from the nose. He and Gonzales went to the latter's home where defendant cleaned himself up. Defendant and the witness then went to a restaurant and ordered food. Defendant looked for his wallet in his back pocket and could not find it. He left and said that he would look for the wallet in his car. Some 5 minutes later the witness saw defendant seated in his automobile and James Stoner standing outside the car. Defendant had blood on his jacket and on his hands. The witness testified on cross-examination that he had been a good friend of the defendant since 1962 and that they had socialized together. In his statement to the police, he did not say that deceased had started the initial fight and did not mention defendant's statement about losing the wallet.

James Stoner testified that he had spent about 2½ hours in the tavern. The deceased called defendant some names, including a reference to defendant's national origin. Then an argument ensued, deceased swung at defendant who retaliated in kind and the first brawl commenced. He did not know who swung first. Defendant then left with Gonzales. Defendant and deceased were both bleeding.

Defendant returned about 45 minutes later. He had nothing in his hands at that time. The deceased seized a beer bottle, broke it and lunged at the defendant who was then 4 or 5 feet away. The witness testified that he noticed nothing in defendant's hands when the parties were rolling on the floor. He did not see the broken bottle when the parties were on the floor,

did not actually see the broken bottle come in contact with defendant and did not see the broken bottle after the incident. He did not tell the police about the bottle. At a bond hearing some 4 months later he testified that deceased grabbed a beer bottle. In court, he did not recall if he then also stated that deceased broke the bottle. On cross-examination he stated, "* * * I sure know he broke a bottle." Defendant had been cut on the lip and cheek and he had blood on his jacket and his hand. He saw defendant's face during the encounter. Defendant "looked scared."

Defendant testified that when he first entered the tavern he asked the deceased if he wished to arm wrestle. Deceased swung at him but did not hit him. He swung back and struck the deceased. After the encounter he had a bloody nose and a "busted lip." He left with Gonzales and went to the latter's house where he cleaned up.

He and Gonzales then went to a restaurant to eat. Defendant said that he would pay. He looked in his back pocket and could not find his wallet. He told Gonzales he would look for it in the car and he left. Failing then to find the wallet, he returned to the tavern. As he was looking "down at the ground" for the wallet, he heard glass break, looked up and saw deceased lunging at him with a broken bottle in his hand. Defendant tried to block the blow but the bottle struck him on the left hand. He swung at the deceased up and down with his right hand. Defendant reached into his left-hand pocket and pulled out a kitchen knife which he had carried all evening. He struck the deceased a number of times and left with the knife in his possession. He had a bloody face and hand. His coat was "shredded." He threw the knife away outside the tavern.

On rebuttal, a number of factual elements were added. Stoner had testified that he saw deceased in a tavern at 5:30 p.m. The widow testified that her husband was home until about 6:50 p.m. Another witness saw defendant after the killing in possession of the knife and saw him discard it. At that time he saw no cuts or blood on defendant's face or hands. The bartender testified that she did not see the incident, that she did not hear the breaking of glass and saw no broken beer bottles on the floor.

In addition, a police officer testified that he arrived at the tavern between 8:30 p.m. and 8:45 p.m. and saw no broken glass on the floor. He saw quantities of blood on the floor. He did not recall a trail of blood leading out of the door. He identified as accurate photographs of the tavern taken 45 minutes to 1½ hours after his arrival which apparently showed no broken glass on the floor. He produced a knife which he "recovered" at the scene.

Another police officer testified that he observed a trail of blood leading out of the tavern door when he arrived at about 8:45 or 9 p.m. He arrested defendant and observed that defendant had lacerations on his face and on his hand. Defendant was unable to produce his wallet.

■█ A statement of the principles of law applicable here is not difficult. The issue of self-defense generally presents a question of fact. (*People v. Holtz* (1974), 19 Ill. App. 3d 781, 790, 313 N.E.2d 234, *appeal denied* (1974), 56 Ill. 2d 589.) Self-defense is an affirmative defense (Ill. Rev. Stat. 1975, ch. 38, par. 7—14). But, where the defendant presents "some evidence" tending to prove this affirmative defense, the burden then rests upon the State to prove guilt beyond a reasonable doubt as to that issue, together with all other elements of the offense. Ill. Rev. Stat. 1975, ch. 38, par. 3—2; see also *People v. Williams* (1974), 57 Ill. 2d 239, 242, 311 N.E.2d 681, and *People v. Warren* (1965), 33 Ill. 2d 168, 173, 210 N.E.2d 507.

■█ In our opinion, the evidence adduced by the State falls short of satisfying the burden of proof beyond a reasonable doubt that the defendant was not acting in self-defense. There are a number of reasons which impel us to this conclusion. The only eyewitness called by the State was, by his own testimony, a heavy drinker. He had consumed a large quantity of alcohol immediately before the incident. He did not know if he was drunk at that time. He also stated, however, that he was "feeling pretty good" and that he was drunk. According to his own assessment of the situation, "he drank a lot." The record even reflects some doubt as to his sobriety at the time of his testimony. He admitted freely that he had a criminal record for burglary, conspiracy and arson. In addition, he gave several different conflicting statements regarding the events of the evening, depending upon who was the interrogator.

■█ Perhaps most important of all was what transpired during his redirect examination when the State's Attorney sought and obtained permission to call him as a court's witness. The State's Attorney proceeded to discredit the witness by use of his previous testimony given at the preliminary hearing. The problem with this procedure was that it served to discredit the witness and to destroy his credibility beyond repair. In addition, this procedure was contrary to law. It permitted the State's Attorney to use hearsay statements of the witness as substantive evidence of guilt. This appears clear from *People v. Bailey* (1975), 60 Ill. 2d 37, 322 N.E.2d 804, where the supreme court pointed out that the State had by this device imparted "substantive character" to prior inconsistent statements by the witness. (See 60 Ill. 2d 37, 43, 44, and cases there cited. See also *People v. Ellis* (1976), 41 Ill. App. 3d 377, 388, 354 N.E.2d 369.) The State's Attorney strongly urged the substance of his examination of the witness Sobieraj upon the court in his final argument.

In our opinion, it follows that by the testimony of this single witness the State has failed to prove beyond a reasonable doubt the most important substantive element of lack of self-defense. It is true that the only remaining eyewitnesses do not present the highest type of impeccable

credibility. However, it must be conceded that in certain aspects of the situation these witnesses do not corroborate each other and both support the basic theory that defendant acted to protect himself against the deadly onslaught of the intoxicated deceased armed with a weapon capable of causing most severe injury to defendant's person.

■■ A broken bottle is legally classified as a dangerous or deadly weapon. (See Ill. Rev. Stat. 1975, ch. 38, par. 24—1(a)(2).) This is especially true in the case before us. According to the defense testimony, the broken bottle was in the hands of a person much taller and heavier than defendant; it was wielded by a person who had been drinking alcoholic liquor and who was enraged against defendant because of the very recent physical encounter between the two persons. Considered under these circumstances, even an unbroken bottle, in this situation, should be classified as a deadly weapon. See *People v. Hunter* (1973), 14 Ill. App. 3d 879, 303 N.E.2d 482; *People v. Fort* (1970), 119 Ill. App. 2d 350, 354, 256 N.E.2d 63.

This record is best described as an attempt by the State to convict the defendant by urging impeachment of defense witnesses and the State's own witness rather than by the presentation of affirmative evidence of its own. It is basic that to be sustained a conviction must rest on the strength of the State's case and not upon the weakness of the testimony presented by defendant. See 14A Ill. L. & Pr. *Criminal Law* §434, at 406 n. 35.5 (1968); *People v. Johnson* (1964), 31 Ill. 2d 321, 324, 201 N.E.2d 367; *People v. Thompson* (1975), 35 Ill. App. 3d 105, 108, 340 N.E.2d 631; *People v. Poltrock* (1974), 18 Ill. App. 3d 847, 850, 310 N.E.2d 770.

■■ It is true that this court should not set aside the result reached by the trier of fact unless it is so unsatisfactory that it raises a reasonable doubt of the defendant's guilt. (*People v. Saunders* (1974), 18 Ill. App. 3d 117, 121, 309 N.E.2d 350.) But, conversely, where as in the case before us, the evidence leaves a reasonable doubt as to the guilt of the accused, the conviction should be set aside. *People v. Gokey* (1974), 57 Ill. 2d 433, 438, 312 N.E.2d 637, and *People v. Garner* (1974), 19 Ill. App. 3d 728, 732, 312 N.E.2d 678.

We also note that the record here presents a serious constitutional issue in that, as above shown, the State obtained permission from the court to dismiss one of its own eyewitnesses without testifying although the State then knew specifically that this witness, if called, would have presented testimony favorable to the defendant despite his earlier statement made to the police which was inculpatory. This situation appears from an affidavit by the witness filed with defendant's motion for a new trial. However, in our opinion, the above analysis and result reached eliminate the need for considering this and other contentions of defendant.

The judgment appealed from is accordingly reversed.

Judgment reversed.

GOLDBERG, P. J., and O'CONNOR, J., concur.