THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MARK ANDREW GOSSETT, Defendant-Appellant.

Second District   No. 81—558

Opinion filed June 24, 1983.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Sally A. Swiss, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Mark Andrew Gossett, was charged by amended information in Winnebago County with four counts of murder for the slaying of Sylvia Ann Davis. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (2).) A jury convicted him of the lesser included offense of voluntary manslaughter (Ill. Rev. Stat. 1979, ch. 38, par. 9—2), and the trial court sentenced him to the Department of Corrections for seven years.

He appeals, contending he was denied a fair trial because (1) the court refused to allow him to present testimony as to specific acts of violence of the deceased where his defense at trial was self-defense, and (2) because the court admitted in evidence a plastic head and mouth-and-throatpiece from an inflatable adult doll which was unrelated to the offense.

It was established at trial that the manslaughter victim, Sylvia Ann Davis, was a prostitute. Davis and another prostitute, Ora Jean Flint, encountered the defendant while they were driving on South Main Street in Rockford at about 1 a.m., on January 13, 1981. The defendant was driving a GMC Suburban van, which belonged to a friend, Robert Ricks. Flint testified that Davis, also driving a van, asked the defendant if he wanted a "date"; he did, and they agreed on a price of $20 for an act of intercourse. The defendant declined Flint's offer to join them, saying he was tired and had to work in the morning. Davis then went with the defendant in his van.

The defendant testified he and Davis shared a "joint" during the short drive to the defendant's trailer. She sat very close to him in the van, and he gave her the $20 from his wallet when she got in. He had cashed a check for $100 earlier that afternoon and still had about $90 when he gave her the $20. The defendant said he had consumed ap-

proximately 13 beers between the time he left work at noon on January 12 and 1 a.m. when he met Davis. He described himself as being "semi-intoxicated."

Defendant testified he and Davis attempted to have intercourse for about half an hour, but that he was unable to achieve an erection and that he passed out. When he awoke, he saw her take his wallet from his pants, which were hanging near the bed. He told her to "get out of there" and lunged at her, knocking the wallet to the floor. She picked up a baseball bat that was leaning against the gun cabinet in the bedroom and, using both hands, swung the bat at him while swearing and calling him a "white motherfucker." She hit him on the neck, and his glasses were knocked off by the blow. He testified he had worn glasses since he was eight years old and could see only shapes without them. He was struck in the elbow, shoulder and head. He knocked the bat out of Davis' hands to the floor, and put his foot on it to prevent her from picking it up. The bat had previously been cracked, and it broke into two pieces when she grabbed for it.

Davis began hitting him with the handle of the bat, and he grabbed her around the neck and wrestled her to the floor, telling her to quit and "it's over." When he released her, she jumped up and tried to knee him in the groin, partially succeeding, and continued to swear at him telling him she was going to kill him. He found the other piece of the bat and began striking her all over with it to get her off him, blocking her blows with his other hand. The fight ended when he swung at her head with all his might and hit her. She fell straight back into a door and the momentum carried him forward on top of her. She moaned when he rolled off her, and he searched for and ultimately found his glasses under the bed.

His nose was bleeding badly, so he got a towel from the bathroom to help stop bleeding. He then saw Davis was bleeding badly from a wound on the side of her head, so he wrapped the towel around her head. When he saw the wound, he said he knew she was going to die. He was afraid the neighbors were going to call the police after hearing all the noise from the fight, so he tried to put her pants and boots on, wrapped her in a blanket and put her in the van. He drove around for awhile, and finally left her in a park-like boat landing area. He returned to his trailer and tried to clean up the blood that was splattered extensively on the walls and floor in the hallway and bedroom area. He then gathered up Davis' wig and the bat pieces, put them in a garbage bag that was in the bathroom and threw the bag in the garbage dumpster outside of the trailer.

Davis' body was discovered later that morning in the boat-landing

area, nude from the waist up, a blanket and leather jacket nearby. A blood-soaked towel was beneath her head. Pathologist William Rouse testified there were three lacerations of the face and head: one vertically along the left eye; one a few inches long in a midline over the top of the head slightly to the left side, and one extending from the right ear to the back of the head horizontally. The deceased's body also bore scratches on the right cheek and under the chin, a small cut on the right side of the lower lip and inside the right cheek corresponding to the area of the teeth, and under the jaw on each side. There was a superficial scrape or brush burn over the shoulder, and two small superficial lacerations on the outer portion of the upper left arm. The back of the inner aspect of the left hand was swollen and recently bruised, consistent with a defense-type of wound. Two transverse scars of recent origin were observed on the victim's inner right wrist. Petechia, pinpoint hemorrhages of small blood vessels, were observed in the whites of the victim's eyes, a condition indicative of manual strangulation of an intensity which could cause death by asphyxiation if maintained long enough. The doctor concluded the immediate cause of death was herniation of the brain due to its swelling caused by trauma to the brain as the result of the skull being struck with a blunt instrument.

Absent the lacerations to the head, the brain swelling and fracture to the back of the skull, the doctor testified there would have been sufficient findings to suggest a cause of death of asphyxia due to manual strangulation. The doctor also testified he found no evidence of "contre-coup" to the head, a type of injury which would occur if a person lying on the ground were struck with a blunt object. An examination of the vaginal cavity showed a few intact sperm heads, a finding compatible with sexual contact within several days' time, but there was no convincing evidence of fresh insemination.

The doctor neither weighed nor measured the body, but estimated it would be between five and $5\frac{1}{2}$ feet in length. The victim's mother, Catherine Brown, testified on rebuttal her daughter was 20 years old, five foot three inches tall, and weighed 120 pounds. She testified her daughter had cut her "leader" (the witness indicated at trial the inner aspect of the right wrist just above the palm) in August 1980, and that she was unable to grasp objects in her right hand, and often required assistance in performing certain tasks, such as dressing, hair combing, and putting on earrings. Davis was able to drive, however, partially using her arm on the steering wheel. The defendant had estimated Davis weighed about 130 or 140 pounds and was about five foot seven or eight inches tall. He indicated at trial that she came up

to between his chin and lower lip. He himself was six feet tall, 160 to 165 pounds.

Acting on information from Ora Jean Flint, the police promptly located the van the defendant had been driving parked next to his trailer. Ricks, the owner of the van, was present when the police arrived at the defendant's trailer and he consented to a search of the van. Samples of blood stains observed therein were tested and found to be consistent with the victim's blood type. The defendant admitted on cross-examination he told the police the blood stains may have been animal blood since he and Ricks had been hunting a couple of weeks earlier. Defendant also admitted on cross-examination that he asked his neighbor to tell the police she had given him the marks on his neck (which looked like hickeys), which she refused to do, and he told the police he got the marks in a fight.

After the defendant's arrest, the police found a plastic garbage bag in a dumpster near his trailer. There was a paper garbage bag inside the plastic one which contained Davis' wig, a portion of a taped baseball bat, two shop towels, a pair of man's jeans, and the head of a plastic adult-size doll. A small chip of wood was found in the wig which appeared to match perfectly a piece of wood that was missing from the defendant's trailer. The police also recovered from the trailer a shop towel similar to the ones found in the dumpster, and a rent receipt for the trailer made out in the defendant's name. A plastic mouth-and-throatpiece that fits into the head of an adult doll was found in the defendant's bathroom storage closet. References to this item and the doll's head found in the dumpster were strenuously objected to by the defendant, and the defendant's second issue is based on the court's admission of those items into evidence over his objection.

Prior to trial, the court granted a motion *in limine* by the State to prevent the defendant from presenting evidence of specific acts of violence on the part of the deceased which were not directed toward the defendant and of which defendant had no knowledge at the time of the incident. The defendant had argued the purpose of the evidence would be to show that the deceased was the aggressor, not what his state of mind was at the time of the incident. As such, his lack of knowledge about these specific prior violent acts of the deceased would not prohibit introduction of that evidence. To preserve the issue, the defendant made two offers of proof during trial. In the first, Rockford police officer Richard Galvanoni testified that on April 6, 1978, he was involved in a violent episode with the deceased, Sylvia Davis. When he was assigned to work undercover vice and prostitu-

tion in the South Main area of Rockford, Davis solicited him and he advised her she was under arrest. She began kicking, screaming and hollering and resisting arrest, and it eventually took four police officers to place her in the marked police vehicle with a cage in it. He stated it was a possibility that he alone may have been able to incapacitate her with a punch, but that it is police policy in the course of an arrest not to punch or "choke out" women. He stated that Davis' wig came off during the fracas and due to the way she was fighting and her strength, he thought perhaps she was a man dressed as a woman.

The second offer of proof was the testimony of former Rockford police officer Gary Thurston concerning an incident involving Davis in September 1976. He was sent to a fast food restaurant to break up a fight. He observed a crowd of about 100 to 150 people, and Davis was standing on a hill yelling threats such as: "I'm going to kill you white motherfuckers. Dirty honky motherfuckers are all going to get killed." Officer Thurston testified:

"[Thurston] A. I told her three times that she had to move on, be quiet and move on, or she was going to be arrested. Each time she told me to get fucked. The third time I placed her under arrest. At that time I grabbed her by the arm. She subsequently kicked me in the crotch, bit me in both hands, knocked off my glasses, and grabbed my revolver. A fight ensued. She pulled on my revolver to the tensile strength of breaking the leather out of it. The only thing holding it on was just the snap over the hammer. At that time I threw her on the ground, got her in a [sic] arm lock. She again kicked me in the leg and nuts. By that time Officer McLester was at the scene, and with great effort we handcuffed her and drug [sic] her kicking to the squad car where she was subsequently locked in the back seat in the cage.

[Defense counsel] Q. During the time when she was kicking at you and punching you, what, if anything, was she telling you, Officer?

A. She was telling me that 'I'm going to kill you, you fucking pig.'

Q. How many times did she say that?

A. Oh, I would say more than once, because I remember quite vividly, especially when I found that my gun was being torn out of my holster.

* * *

Q. Did you see her conduct in the squad car?

A. Yeah. She was yelling out of the window different things, one of which was 'No motherfucking pig is going to get me. Get you mother. I'm going to get you.' "

The court refused both offers of proof.

The defendant claims it was error for the court to have refused the offers. He urges this court to reconsider its position taken in *People v. Wolski* (1980), 83 Ill. App. 3d 17, wherein we upheld the exclusion of evidence that the deceased had participated in fights at school because the defendant did not know of the deceased's propensity for aggression at the time of the incident. In *Wolski*, we adhered to the established rule that:

"[W]here a claim of self-defense is made, and at the time of the incident the accused knew of the victim's reputation for violence or knew of specific violent acts by the victim, proof of such reputation or acts together with the accused's knowledge thereof is relevant and admissible to establish the reasonableness of the accused's apprehension of danger. [Citations.]

*** '[E]vidence concerning the violent temper and disposition of the deceased and his prior threats to the defendant is admissible as tending to show the circumstances confronting the defendant, the extent of his apparent danger, and the motive by which he was influenced. Such circumstances are relevant in that they tend to show the defendant's state of mind. [Citations.]' [Citation.]

*** [T]he law in Illinois still requires the exclusion of evidence of a victim's propensity for aggression unless the accused knew the victim had that trait." *People v. Wolski* (1980), 83 Ill. App. 3d 17, 29-30.

The defendant relies on *People v. Baer* (1976), 35 Ill. App. 3d 391, wherein the court acknowledged the general rule that evidence of specific prior instances of misconduct are irrelevant to the issue of the deceased's general reputation. However, *Baer* concluded that where the evidence of specific misconduct is offered to establish a character trait of the victim, not his general reputation, "specific prior incidents of violent aggression by the victim may be admissible as tending to show that he was the aggressor in the incident. 1 Wigmore on Evidence sec. 198 (3d ed. 1940)." (35 Ill. App. 3d 391, 396.) Nevertheless, *Baer* held the evidence proffered there (an arrest for disorderly conduct) was insufficient to prove the victim had a violent nature and, thus, it was not error in that case to exclude it.

The State urges this court to adhere to its position taken in *Wolski* and *People v. Vega* (1982), 107 Ill. App. 3d 289. *Vega* followed

*Wolski* in finding that the trial court properly excluded evidence of the victim's arrest record (criminal damage to property over $150, burglary, fighting, reckless driving, unlawful possession of cannabis, battery and aggravated battery) where the defendant claimed knowledge of the victim's trouble with the police, but not his arrest record. This court stated even if it had determined that the evidence was erroneously excluded, it would have been harmless beyond a reasonable doubt because the court had already admitted substantial evidence concerning the victim's violent acts. That evidence included testimony that the victim "had engaged in a pattern of threats and violence toward defendant for many years, and that [the victim] had inflicted serious injuries upon others." *People v. Vega* (1982), 107 Ill. App. 3d 289, 292.

The State posits that evidence of the victim's prior acts of violence would be highly inflammatory and of no probative value. Further, such evidence would not have any "real bearing" on what occurred in the situation at issue. The State urges that if this court should decide the evidence was erroneously excluded, that it was harmless error. The State points out that three witnesses testified at trial to the victim's general reputation for violence in the community. We note that the record reveals the three reputation witnesses were a prostitute, a former prosecutor-attorney currently officing in the same building as defense counsel, and a former Rockford police officer—not identified as such at trial—employed at the time of trial by the Department of Public Safety in Alaska.

The State argues the relevancy of the two excluded offers of proof was severely undermined by the fact both incidents occurred well before August 1980, at which time the deceased suffered a serious cut in her right wrist which limited her ability to grasp objects and perform various routine tasks. Further, the State argues the verdict would not have been different even if the jury had heard the excluded proof. It points out the defendant could not reasonably have feared great bodily harm or imminent death at the hands of the deceased given their height and weight differences and considering the evidence of the minor injuries suffered by the defendant compared with the "calamitous" injuries sustained by the deceased.

■ We believe the defendant's position on this issue has merit, but that a re-examination of our decision in *Wolski* is not necessary since we find that case is distinguishable. As pointed out in *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 16-17:

"One purpose of the testimony may be to show the reasonableness of the defendant's state of mind in acting in self-defense;

a second purpose may be to support the defendant's testimony that the deceased was the aggressor. (*United States v. Burks* (D.C. Cir. 1972), 470 F.2d 432, 434-35.) These distinct purposes serve different functions and carry different requirements as to the defendant's knowledge of the deceased's character and reputation. (1 Wigmore, Evidence sec. 63 (3d ed. 1940); Annot., 1 A.L.R. 3d 571, 575-76 (1965).) When used for the first purpose, the defendant must have known the information concerning the deceased when the act of self-defense occurred. This requirement is entirely correct, flowing from the subjective use to which the testimony is put—supplying insight into the defendant's state of mind and his beliefs regarding the danger he was in. A requirement that the defendant knew of the deceased's propensity for violence is unrelated to the second purpose, however. Evidence that the victim was a violent person or committed violent acts helps corroborate the defendant's testimony that the deceased was the initial aggressor; the defendant's lack of knowledge concerning the deceased's reputation for character does not affect the relevancy of evidence offered for this purpose.

\*\*\*

Many decisions in Illinois focus on only the first purpose *and therefore do not serve as authority regarding the second.* '[T]he law in Illinois still requires the exclusion of evidence of a victim's propensity for aggression unless the accused knew the victim had that trait.' (*People v. Wolski* (1980), 83 Ill. App. 3d 17, 30, 403 N.E.2d 528, 538.)" (Emphasis added.)

As noted in Annot., 1 A.L.R. 3d 571, 601 (1965), 21 jurisdictions besides Illinois (citing *People v. Buchanan*) have adopted the view that where the issue of self-defense is raised, evidence of the victim's turbulent character is admissible in a trial for homicide or assault to corroborate testimony as to the circumstances of the encounter whether or not the defendant had knowledge of such character trait. Annot., 1 A.L.R. 3d 571, 601 (1965), and 203 (Supp. 1982).

The rule that specific prior incidents of violent aggression by the victim may be admissible as tending to show that the victim was the aggressor in the incident was first expressed in *People v. Baer.* It subsequently has been approved in *People v. Montgomery* (1977), 51 Ill. App. 3d 324, *People v. Buchanan* (1980), 91 Ill. App. 3d 13, and *People v. Fischer* (1981), 100 Ill. App. 3d 195. As noted in *Buchanan*:

"Character and reputation are distinct—character pertains to what one actually is, and reputation concerns what one .

thought to be. (*People v. Hicks* (1935), 362 Ill. 238, 243, 199 N.E. 368, 370.) Character is shown by proof of specific acts, and when the deceased's character is being proved to support a claim of self-defense, acts of violence are admissible. *People v. Baer* (1976), 35 Ill. App. 3d 391, 396, 342 N.E.2d 177, 181-82." *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 16.

■ Although this court rejected *Baer* in its *Wolski* opinion, we believe *Buchanan* correctly distinguishes our decision in *Wolski* on the basis the evidence there was offered to show the reasonableness of the defendant's state of mind in acting in self-defense. Consequently, our decision in *Wolski* is not apposite here and would not bar the admission of evidence of specific acts offered for the second purpose, to corroborate the defendant's testimony that the deceased was the aggressor. *Wolski* is also distinguishable in that the trial court's refusal to instruct on self-defense was upheld because we found the record there was devoid of evidence of self-defense. Such is not the case here; the jury was instructed on self-defense as well as voluntary and involuntary manslaughter.

Our decision in *People v. Vega* (1982), 107 Ill. App. 3d 289, impliedly recognized the different purposes for which evidence of the decedent's violent temperament may be offered when it cited to *People v. Buchanan*, but we found there that the excluded evidence would merely have been cumulative where the record already contained substantial evidence of the victim's violent acts toward the defendant and others. *People v. Vega* (1982), 107 Ill. App. 3d 289, 291-92.

No such saving feature appears in the case at bar. The testimony of the three witnesses as to the victim's general reputation for violence in the community was very brief, and hardly probative of the issue of the decedent's aggressive character. "A person's specific acts are obviously more probative of that person's character than is his reputation." (*People v. Robinson* (1977), 56 Ill. App. 3d 832, 839.) Defendant's testimony here was the only evidence admitted to show that the deceased was the aggressor. However, the defendant was the one "who was on trial, directly interested in the verdict, and these circumstances might very well affect his credit with the jury. He had a right to have the evidence of the disinterested witnesses which he offered heard." *People v. Dugas* (1923), 310 Ill. 291, 296.

Defense counsel clearly explained the intended purpose of his offers of proof at trial, and in this appeal the defendant has submitted supportive authority sufficiently distinguishing this court's opinion in *Wolski* so as to negative that decision as authority to the contrary. Accordingly, we conclude the trial court erroneously excluded the of-

fers of proof.

■■ We further conclude the error was not harmless beyond a reasonable doubt for some of the same reasons the State finds harmlessness. In rebutting the defendant's affirmative defense, the State did not present any evidence of the deceased's reputation for peacefulness as was its right after the defendant attacked the reputation of the deceased. (*Davis v. People* (1885), 114 Ill. 86; *Kelly v. People* (1907), 229 Ill. 81; McCormick, Evidence sec. 193, at 461 (2d ed. 1972).) Rather, the State presented rebuttal testimony from the deceased's mother concerning her daughter's limited use of her right hand, her age, her height and weight, and concerning the various tasks her daughter had difficulty performing as a result of her disability. Defense counsel elicited on cross-examination that the deceased was able to drive a van by holding her arm on the steering wheel. The deceased's mother said she erroneously told one of the investigating officers she thought it was her daughter's left arm that was troublesome because she was upset and nervous at the time. The State also called Doctor Rouse in rebuttal. The doctor testified further concerning the deceased's wounds and the circumstances which would have produced such wounds.

In our view, the excluded offers of proof illustrated that despite her sex, height and weight, the deceased could fend for herself. She freely and vociferously threatened to kill whites and police officers, and fully utilized all parts of her anatomy (her feet and knees) when fighting. She was contemptuous of police authority, verbally abusive toward police officers, and resisted lawful arrest by physically attacking her captors. In arguing the harmlessness of the error, we find the State's comparison of the respective injuries sustained by the deceased and the defendant without merit. The defense of justifiable use of deadly force against any attacker would be meaningless if, as a prerequisite to such defense, the defendant would be required to exhibit mortal wounds to himself as well. The force used is justified if "necessary to *prevent* imminent death or great bodily harm." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 7—1.) As noted in *People v. Scott* (1981), 97 Ill. App. 3d 899, 903:

> "The difference between self-defense and voluntary manslaughter is in the reasonableness of the defendant's subjective belief. If reasonable, then a jury is justified in finding the defendant acted in self-defense. If unreasonable, the jury is justified in returning a verdict of voluntary manslaughter."

In addition to being probative of the question of aggression, the offers excluded here would have provided testimony which, if believed

by the jury, would have also rendered reasonable the defendant's use of *deadly* force against the deceased. It is one thing for the jury to accept the fact of the deceased's aggression; it is another for the jury to find the defendant was justified in using the *amount* of force he did. The court's erroneous exclusion of admissible evidence offered in this case to show the former fact, denied the defendant some concomitant equally corroborative and probative evidence as to the latter fact.

We conclude the error may have contributed to his conviction for voluntary manslaughter and, therefore, was not harmless beyond a reasonable doubt. *People v. Adams* (1981), 102 Ill. App. 3d 1129, 1133; *People v. Knippenberg* (1977), 66 Ill. 2d 276, 287.

■■ Also in connection with this issue, the defendant argues it was error for the court to exclude evidence of Davis' commitment as a juvenile offender by analogy to *People v. Norwood* (1973), 54 Ill. 2d 253, and *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105. In essence, those cases held the confidentiality provision of the Juvenile Court Act (Ill. Rev. Stat. 1981, ch. 37, par. 702—9(1)) should not be construed to prohibit access to records of a juvenile delinquent when the records are sought to impeach the credibility of the juvenile as a witness. The State counters that the court properly excluded evidence of the victim's juvenile record, which was indirectly sought to be introduced through the testimony of two witnesses (a juvenile counselor and a probation officer) who were to testify about the deceased's general reputation for violence. Such an indirect reference, the State argues, was properly excluded even under the reasoning of *Baer* because the defendant failed to make an offer of proof that the juvenile record involved any crimes of violence. The State finds the defendant's citations to *People v. Norwood* and *Davis v. Alaska* inapposite where the witness sought to be impeached is deceased, and the State's proof did not in any manner depend on her credibility. We concur with the State's response to the defendant's argument on this issue, and further discussion is not merited.

■■ The defendant's other contention in this appeal is that the trial court abused its discretion in ruling admissible the head of a plastic adult doll and mouth-and-throatpiece. The State argued the items were admissible because the head of the doll, a bloodied portion of the baseball bat which was the murder weapon, the victim's wig and a number of other items were found together in a bag in a dumpster near the defendant's trailer. A plastic mouth-and-throatpiece compatible with such a doll head was found in a storage closet in the defendant's bathroom. The State posited the items were admissible

because they tended to connect the defendant with the crime, and the court admitted them.

The defendant argues there was no evidence linking the doll parts to the acts upon which the murder counts were based, and that introduction of the other items found in the bag in the dumpster would have been sufficient to establish a connection with the defendant. He charges the admission of the doll parts constituted a prejudicial distraction to the jury. He contends the jury may have inferred from the items that the defendant, already shown to have engaged the services of a prostitute, may regularly have participated in "aberrant sexual practices." The jury may thus have concluded the defendant's sexual character led him to the commission of a homicide or that his testimony was not entitled to credibility.

The State counters that even though other items found in the dumpster also connected the defendant with the crime, it was entitled to present all relevant evidence. It notes none of the items of evidence challenged in the cases cited by the defendant had any other relevance to the case once it was determined the item was not the criminal instrumentality. (*People v. Miller* (1968), 40 Ill. 2d 154, *cert. denied* (1968), 393 U.S. 961, 21 L. Ed. 2d 375, 89 S. Ct. 401 (medical instruments); *People v. Liapis* (1972), 3 Ill. App. 3d 864 (an oil can); *People v. Wade* (1977), 51 Ill. App. 3d 721 (a .357 magnum).) Also, the judgment of the trial court excluding an artificial penis in *People v. Limas* (1977), 45 Ill. App. 3d 643, was affirmed on the basis that it had not been shown that the defendant was acting in self-defense of a homosexual attack. Further, no offer of proof was made there which would have made admission of the artificial penis probative. The defendant there was trying to establish the reasonableness of the defendant's need to defend himself. However, it was not shown where on the deceased's body the article was found. Consequently, the court found the jury could not have inferred that the victim was reaching for the artificial penis, and its admission would only have been a prejudicial distraction from the issues in the case.

Evidence is admissible if it is relevant and material. "[T]he most acceptable test of relevancy is the question, does the evidence offered render the desired inference *more probable than it would be without the evidence?*" (McCormick, Evidence sec. 185, at 437 (2d ed. 1972).) Admissibility may depend also, however, upon whether the probative value of the evidence outweighs its prejudicial effect to the defendant. (*People v. Monroe* (1977), 66 Ill. 2d 317.) The exercise of the trial court's discretion regarding the admission of demonstrative evidence will not be interfered with unless there has been abuse resulting in

prejudice to the defendant, and where the record establishes a sufficient basis for the trial court's decision. *People v. Jones* (1982), 108 Ill. App. 3d 880, 884; *People v. Spann* (1981), 97 Ill. App. 3d 670, *cert. denied* (1982), 455 U.S. 954, 71 L. Ed. 2d 671, 102 S. Ct. 1462.

■ The plastic doll head and mouth-and-throatpiece were identified at trial by Rockford Detectives Colin Anderson and Roger Andersen, respectively. In each instance, the detectives perfunctorily identified the item, and, in response to a defense objection, the court cautioned that Andersen's testimony should be limited strictly to identification, not characterization, of the mouth-and-throatpiece. Accordingly, he testified only that "[i]t's an artificial throat and mouth commonly found that fits into the head of an artificial doll." On cross-examination of the defendant, the prosecutor intimated that the defendant had thrown away the items that were found in the dumpster because he wanted to get rid of the evidence of the crime. The defendant denied the doll's head was used in any manner with Sylvia Davis. He explained the doll's head was already in the garbage bag in the bathroom and that he simply threw it away with the other items that were found in the dumpster. He testified he did not know if he had thrown away the entire doll's head. In closing argument, the prosecutor mentioned the doll's head again in listing the items that were found in the dumpster, but he drew no "reasonable inference" from its presence there.

In conjunction with our reading of this record, we have viewed the exhibits at issue here, and find the court did not abuse its discretion in admitting them. Evidence is admissible if it fairly tends to prove the particular offense charged, and any circumstance may be put in evidence which tends to make the proposition at issue more or less probable. (*People v. Miller* (1981), 98 Ill. App. 3d 453, 458.) The jury was entitled to draw its own inferences from the circumstance of the doll's head being found with other incriminatory evidence in the dumpster, and the mouth-and-throatpiece found in the defendant's bathroom fairly tended to connect him with the items found in the dumpster. We note these actual exhibits were not available to the jury for inspection during its deliberations, only a photograph of the doll's head grouped with the other items recovered from the dumpster.

The judgment of the circuit court of Winnebago County is reversed and remanded for a new trial in accordance with this opinion.

Reversed and remanded.

HOPF and VAN DEUSEN, JJ., concur.