THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CALVIN FLOREY, Defendant-Appellant.

First District (1st Division)   No. 85—0916

Opinion filed February 23, 1987.

Barnett & Raab, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Sharon L. Gaull, and Paul A. Tanzillo, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINLAN delivered the opinion of the court:

The defendant, Calvin Florey, was charged by indictment in the circuit court of Cook county with the murder of George DelValle. Following a bench trial, he was found guilty of voluntary manslaughter and sentenced to seven years' imprisonment. The defendant appeals and raises the following contentions: (1) the State failed to prove beyond a reasonable doubt that the defendant did not stab the victim in self-defense; (2) the trial court deprived the defendant of a fair trial when it prevented the defendant from introducing evidence of the victim's violent behavior; (3) the trial court abused its discretion by arbitrarily refusing to impose a sentence of probation; and (4) the trial court abused its discretion by imposing an excessive sentence of seven years' imprisonment.

We affirm.

Joseph Glorioso, the only eyewitness that testified for the State, said that he and his wife were drinking beer in Chicago's Hamlin Park with the victim, George DelValle, and the victim's fiancee, Gretta Erazo, during the early hours of April 10, 1983. Glorioso said that the four left the park at approximately 12:30 a.m. to drive Erazo home. On the way, Glorioso stopped at a gas station on the southwest corner of the intersection of Damen Avenue and Roscoe. After Glorioso paid for the gas, he heard the driver of a silver pickup truck yelling "PBC Love" and "I'll kill you like we did your brother." Glorioso stated that the truck was stopped at the intersection and that he saw three people in the truck cab and other people hiding in the bed

of the truck. Glorioso said the yelling caused him to become agitated, so he obtained a baseball bat which was in the rear of his van and threw it at the truck. Glorioso stated that the bat hit the side of the truck as the truck drove off. Thereafter, Glorioso said that DelValle got out of the van and joined him as he picked up the bat he had thrown at the truck. At that point, Glorioso saw two men running towards them from the opposite corner of the intersection. Glorioso testified that the victim ran towards the rear of the van and that he did not observe anything in the victim's hand at that time.

Glorioso further testified that the two men ran past him and attacked the victim. Glorioso stated that one of the attackers hit the victim on the leg with a bat, knocking him to the ground. The other one, he said, then stabbed DelValle twice in the head and twice in the back as he was on his hands and knees. Glorioso described the one with the knife as having blondish-brown hair, being taller than the other attacker and wearing a tan jacket. Glorioso also testified that no more than two or three seconds had passed when he heard more gang slogans and was immediately attacked by three additional individuals carrying baseball bats. He said he was knocked down and beaten for about 15 or 20 seconds before the assailants ran away.

After the attack, Glorioso said he saw the victim staggering down Damen. Glorioso stated that he then spotted a plainclothes policewoman and told her what had happened. The policewoman then drove him around the area in an unsuccessful attempt to locate the attackers. However, upon his return to the gas station, Glorioso saw the man in the brown jacket who had stabbed his friend sitting inside the silver pickup truck and pointed him out the the police. Glorioso identified the defendant as the man he had pointed out to the police.

On cross-examination, Glorioso said that he drank four or five beers on the night of the incident. He also admitted that he had previously been a member of a street gang called the "Deuces" but claimed that he was no longer a member at the time of the incident. Glorioso denied that he yelled anything at the people in the pickup truck and denied that the individuals in the pickup truck yelled "Deuce Killers" before the attack. Glorioso admitted that he did not see the defendant in the pickup truck at first. He only saw the defendant in the truck upon his return with the policewoman. Finally, Glorioso admitted that he stood by and watched as the victim was stabbed but explained, however, that only two or three seconds elapsed from the time he saw the victim being attacked and the time he also was attacked.

The victim's fiancee, Gretta Erazo, also testified for the State at

the defendant's trial. She stated that she and the victim were at the victim's parents' house on the evening of April 9, and, at approximately 11:30 p.m., they left and walked to the park, where they met Joseph Glorioso, Glorioso's wife and some other people. While in the park, Erazo said she drank one beer, and, while she said that she saw the victim drinking beer at his home as well as in the park, she could not estimate the amount of beer the victim had consumed that evening.

Erazo corroborated Glorioso's testimony that they left the park in Glorioso's van and that Glorioso stopped at the intersection of Damen and Roscoe to get gas. Erazo said she saw a silver pickup truck, facing north on Damen, waiting for the traffic light to change. She stated that she also heard voices, but, because the radio inside the van was on, she could not tell what was being said. Erazo further testified that she saw Glorioso throw a baseball bat at the truck as it turned westbound onto Roscoe. The victim exited the van at that time and approached Glorioso.

Thereafter Erazo said that she saw two men running toward the van and that, while Glorioso stood still, the victim ran past the van on one side, and the other two men ran past on the opposite side. She claimed that she lost sight of the victim and these two men at that point because she could not see out of the van's rear windows. Erazo also testified that she never saw anything in the victim's hands and that one of the men was carrying a bat and the other carried what looked like a knife. However, Erazo admitted on cross-examination that the first time she told a law-enforcement official about the knife-like object was when she told an assistant State's Attorney about the object a few weeks prior to trial. She described the man with the knife as tall, blond and wearing a light-brown jacket. She further stated that she had also seen two or three additional individuals with baseball bats attack Glorioso. After the attack, Erazo said she got out of the van and was informed by an unidentified individual that the victim was lying in the street. Erazo said she went down the street and found the victim approximately one-half block south of the service station.

The defendant testified in his own behalf and stated that, on the evening of April 9, 1983, he was being driven home from a party by a friend whom defendant knew to be a member of the "Paulina/Barry Coalition" (PBC) street gang. However, the defendant insisted that, while the other occupants of the car were PBC members and that additional PBC members rode ahead of them in a silver pickup truck, he was not a member of the PBC street gang. While the two vehicles

were waiting for the traffic light to change at the intersection of Roscoe and Damen, the defendant saw Joseph Glorioso in a gas station and heard him yelling "Insane Deuces." The defendant admitted that the occupants in the pickup truck were also yelling, but he claimed that he did not know what they were yelling. After Glorioso threw the bat at the truck, the defendant said that one of the other occupants of the automobile in which he was riding got out with a baseball bat, approached Glorioso and began fighting with him. The defendant admitted that he also exited the car at that time, but he asserted that he did so only in an attempt to break up the fight and to persuade his friend to return to the car. The defendant claimed that he had nothing in his hand at that time and that his hunting knife, which he did have with him, was inside his belt. According to the defendant, Glorioso swung his bat at him but missed, and the defendant said he became frightened and ran into the gas station area. He stated he then encountered the victim there holding an object in his hand which the defendant described as being 2 or 3 feet long and dark in color. The defendant testified that he thought it was either a baseball bat or a branch. The victim shouted "you fucking punk," and swung the object at him but missed. The defendant claimed that he pulled his knife at that time because he feared for his life. He said he only slashed at the victim, with a side-to-side horizontal motion, in order to keep him away and insisted that he did not intend to kill the victim. While the defendant admitted that he struck the victim in the back a few times with the knife, he denied causing any of the victim's head wounds. The defendant testified that, after slashing at the defendant, he ran away and threw his knife in an alley near some garbage cans. The defendant said that he then returned to the gas station, where he was arrested by the police.

On cross-examination, the defendant also admitted that the first time he told anyone that the victim called him a "fucking punk" was at trial. Additionally, the defendant admitted giving conflicting accounts of the incident to the police. The defendant acknowledged that he initially told the police that he was riding in the pickup truck but that he knew nothing about the incident. He subsequently told the police that he was in the automobile and that he stabbed, not slashed, the victim. He also admitted giving conflicting accounts to the police as to whether or not the victim was standing, stumbling, or on the ground when he stabbed him. He attempted to explain away these inconsistencies by claiming that he lied to the police at first because again he was frightened.

Additionally, the defense presented numerous character witnesses

who testified that the defendant had a good reputation for truthfulness and veracity as well as for being a peaceful and law-abiding individual.

Thereafter, as previously stated, the trial judge found the defendant guilty of voluntary manslaughter and denied the defendant's motion for a new trial. Following a sentencing hearing in which the trial court heard the testimony of two psychiatrists and other witnesses presented by the defendant, the court sentenced the defendant to seven years' imprisonment.

The defendant initially contends that the State failed to prove beyond a reasonable doubt that the defendant did not stab the victim in self-defense. The defendant argues that the testimony of the State's only eyewitness, Joseph Glorioso, was patently incredible and unworthy of belief while other evidence in the record demonstrated the reasonableness of the defendant's actions. He thus asserts that this evidence of the reasonableness of his actions, together with the evidence introduced that the defendant's reputation is that of a truthful and peaceful individual, clearly demonstrates that the State has failed to meet its burden. The State, on the other hand, contends that it was the defendant's claim that deadly force was necessary to protect himself from death or great bodily harm that was patently unreasonable, and, further, the trial court's finding rejecting the defendant's claim is adequately supported by the record and, accordingly, should not be overturned by this court.

■■ ■ Self-defense is an affirmative defense (Ill. Rev. Stat. 1985, ch. 38, par. 7—14), and once a defendant introduces some evidence tending to prove that he acted in self-defense, as the defendant contends he did here, the State is required to prove beyond a reasonable doubt that the defendant did not act in self-defense in addition to the other elements of the offense charged. (*People v. Lester* (1981), 102 Ill. App. 3d 761, 430 N.E.2d 358; *People v. Adams* (1979), 71 Ill. App. 3d 70, 388 N.E.2d 1326; *People v. Villalobos* (1977), 53 Ill. App. 3d 234, 368 N.E.2d 556.) Furthermore, where a defendant attempts to justify a killing on the basis of self-defense, the court must determine whether the defendant's belief that the situation required deadly force was a reasonable belief under the circumstances. (*People v. Aguero* (1980), 87 Ill. App. 3d 358, 363, 408 N.E.2d 1092.) This court will not upset the trial court's finding unless the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to the defendant's guilt. *People v. Carter* (1985), 135 Ill. App. 3d 403, 481 N.E.2d 1012.

■ It was the province of the trial judge, as the trier of fact, to determine the credibility of witnesses and the weight to be accorded

their testimony. (*People v. Lester* (1981), 102 Ill. App. 3d 761, 430 N.E.2d 358.) The defendant testified that the victim was the aggressor and, additionally, was armed with either a baseball bat or a tree branch. However, the defendant was confronted with his prior inconsistent statements in which he admitted that he lied to the police. Two of the State's witnesses, Glorioso and Erazo, testified that they saw nothing in the victim's hands. Glorioso further testified that the defendant and his companion were the aggressors and that the victim was on his hands and knees when the defendant stabbed him. It was entirely proper for the trial judge to resolve this factual dispute, which he did, in favor of the State by finding that, even though the defendant's actions were defensive with respect to Glorioso's action in throwing the baseball bat, the defendant's belief that deadly force was necessary to defend himself against the victim was unreasonable.

■ The defendant also claims that the testimony of the State's only eyewitness, Joseph Glorioso, is incredible and unworthy of belief. He asserts that Glorioso's version is incredible because, according to Glorioso, not only did the two individuals run past Glorioso, the one who threw the baseball bat, in order to attack the victim, but also Glorioso merely stood by and watched his friend get stabbed. The defendant cites *People v. Villalobos* (1977), 53 Ill. App. 3d 234, 368 N.E.2d 556, as support for his argument. However, we find the facts of *Villalobos* to be clearly distinguishable from the instant case. The defendant in *Villalobos* was convicted of murder despite his testimony that he stabbed the victim there in self-defense. The appellate court reversed the murder conviction, finding that the testimony of the State's single eyewitness fell far short of proving beyond a reasonable doubt that the defendant did not act in self-defense. The appellate court in *Villalobos* noted that the State's eyewitness there was a heavy drinker, that he consumed a large quantity of alcohol prior to the killing and, at one point in his testimony, said he was drunk at the time of the killing. The appellate court also observed that the record in *Villalobos* raised doubts as to the witness' sobriety at the time of trial. Furthermore, the witness there had given several conflicting statements and was impeached by both defense counsel and the State itself. The witness also admitted that he had a criminal record for burglary, conspiracy and arson. Under those circumstances, the appellate court concluded that the witness' credibility was destroyed beyond repair.

Clearly, the alleged implausibility in what the defendant claims to be the normally expected behavior under such circumstances and Glorioso's behavior here is in no way analogous to the extreme lack of

witness credibility exhibited in *Villalobos*. Additionally, Glorioso explained his behavior here stating that he was attacked himself within seconds of the men's running past him and attacking the victim, and Gretta Erazo, the victim's fiancee, confirmed Glorioso's testimony on this matter. Furthermore, as previously stated, it was for the trial court to assess the credibility of the witnesses and the weight to be accorded their testimony, and the trial court's resolution of a disputed matter will not be set aside unless it is palpably erroneous. (*People v. Lester* (1981), 102 Ill. App. 3d 761, 766-67, 430 N.E.2d 358.) Thus, we do not find the evidence here so implausible, improbable or unsatisfactory as to create a reasonable doubt as to the defendant's guilt. See *People v. Carter* (1985), 135 Ill. App. 3d 403, 481 N.E.2d 1012.

The defendant next contends that the trial court prevented him from introducing evidence of the victim's violent behavior. He claims this occurred during his redirect examination where he testified that he had recognized the victim when he saw him in the gas station because he had seen him before in court. However, when the defendant attempted to explain the circumstances of that encounter, the prosecution objected and the trial court sustained the objection. The defendant then made an offer of proof and testified that he had seen the victim before when he accompanied his friend to court and that the victim had been charged with allegedly shooting the defendant's friend. After the offer of proof, the trial court again sustained the objection.

The defendant argues that this evidence was admissible on the issue of the reasonableness of his state of mind at the time of the stabbing since the defendant claims he thus had firsthand knowledge of a prior violent act by the victim. Furthermore, the defendant argues that the evidence is also admissible since it corroborates his version of the story that the victim was the aggressor. The State claims that the defendant failed to preserve this issue by failing to include it in his written motion for a new trial and that the evidence was, in any event, unreliable and speculative since the defendant only stated that the victim was accused, not convicted, of shooting his friend. Therefore, the State argues that the trial court properly excluded the proffered evidence.

Where a defendant claims that he killed an individual in self-defense, and some evidence of self-defense is introduced at trial, evidence of the victim's reputation for violence, as well as evidence of specific violent acts and threats, may be admissible as proof of the victim's violent and turbulent character. (See *People v. Carbajal* (1978), 67 Ill. App. 3d 236, 241, 384 N.E.2d 824; *People v. Graves*

(1978), 61 Ill. App. 3d 732, 378 N.E.2d 293.) Furthermore, the violent acts or threats need not necessarily be directed at the defendant to be admissible. (*People v. Gall* (1979), 79 Ill. App. 3d 823, 828, 398 N.E.2d 1118.) As our supreme court explained in *People v. Lynch* (1984), 104 Ill. 2d 194, 199-201, 470 N.E.2d 1018:

"A victim's aggressive and violent character may tend to support a theory of self-defense in two ways. First, the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior. The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies. One can only consider facts one knows, however, and evidence of the victim's character is irrelevant to this theory of self-defense unless the defendant knew of the victim's violent nature * * *.

Second, evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened. In this situation, whether the defendant knew of this evidence at the time of the event is irrelevant."

However, even though this evidence may be admissible, reversible error does not always occur if a trial court improperly excludes such evidence. See *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 414 N.E.2d 262; *People v. Gall* (1979), 79 Ill. App. 3d 823, 398 N.E.2d 1118; *People v. Adams* (1979), 71 Ill. App. 3d 70, 388 N.E.2d 1326.

Here, the defendant testified that he recognized the victim on the night of the stabbing because he had seen him previously at court, but the trial court refused to admit evidence that the victim was apparently being prosecuted, at that time, for shooting one of the defendant's friends. The fact that the State prosecuted the victim for allegedly shooting one of the defendant's friends is not evidence that the victim had a reputation for violence, and, while the defendant argues on appeal that he had firsthand knowledge of this violent act, it is not apparent from his offer of proof. If anything, the proffered evidence concerns merely an allegation of a single prior prosecution by the State. As such, the trial court could properly rule the evidence inadmissible since, under the circumstances, it made neither the reasonableness of defendant's belief that deadly force was necessary nor the proposition that the victim was the aggressor more probable. (See *People v. Rodgers* (1972), 53 Ill. 2d 207, 290 N.E.2d 251.) Also, in the cases cited by the defendant in support of his position, the proffered

evidence related to convictions for violent acts, to the victim's reputation for violence, or to the witness' personal knowledge of specific violent acts by the victim. (See, *e.g.*, *People v. Lynch* (1984), 104 Ill. 2d 194, 470 N.E.2d 1018; *People v. Gossett* (1983), 115 Ill. App. 3d 655, 451 N.E.2d 280; *People v. Evans* (1982), 104 Ill. App. 3d 598, 432 N.E.2d 1285; *People v. Adams* (1979), 71 Ill. App. 3d 70, 388 N.E.2d 1326.) Furthermore, we are convinced that any error that might have occurred, even assuming it was error to fail to admit this evidence, was harmless beyond a reasonable doubt in light of the evidence in the record here against the defendant. See *People v. Gall* (1979), 79 Ill. App. 3d 823, 828, 398 N.E.2d 1118.

The defendant's next contention is that the trial court arbitrarily denied his request for probation and sentenced him to a term of imprisonment. The defendant claims that the trial judge's comments at the sentence hearing demonstrate that probation was arbitrarily denied in his case. First, the defendant argues that the judge's comment that an individual died as a result of the defendant's conduct indicates that the denial of probation was improper since the Illinois General Assembly permits probation to be imposed for a conviction of voluntary manslaughter and, therefore, the fact that a death occurred is not a basis for denial of probation. Second, the defendant argues the trial judge's observation that the defendant acquainted himself with gang members demonstrates that the trial judge denied probation because the defendant was a member of a class that the judge considered not entitled to probation under any circumstances, and, thus, was also not a proper ground for denial of probation. Finally, the defendant argues that the trial judge's assertion that the public needed protection from the defendant's "explosive" personality was not a sufficient basis for denial of probation because there was no evidence introduced at trial to support the judge's conclusion concerning the defendant's personality.

The decision to grant or deny probation is a matter within the discretion of the trial court. (*People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552, 301 N.E.2d 300.) In reviewing a trial court's decision not to grant probation, this court's inquiry is limited to "determining whether the trial court did, in fact, exercise its discretion or whether it abused that discretion by action in an arbitrary manner." *People v. Bolyard* (1975), 61 Ill. 2d 583, 586, 338 N.E.2d 168.

We have reviewed the trial court's comments and, contrary to defendant's claim, we do not find that they express any improper basis for the denial of probation to the defendant here. Contrary to the defendant's claim, the judge's comments did not indicate a policy

which would entirely preclude the defendant from receiving probation because of the defendant's gang relationship. The situation here is unlike that in *People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168, and *People v. Wilson* (1977), 47 Ill. App. 3d 220, 361 N.E.2d 1155. In *Bolyard*, the trial court expressed an inflexible policy against granting probation to defendants convicted of indecent liberties with a child, and, in *Wilson*, the trial court's comments demonstrated that no one convicted of the offense of delivery of a controlled substance would be granted probation. Here, however, the trial judge did not express any policy or view which precluded probation for any defendant convicted of voluntary manslaughter merely because gang-related associated activity was involved. Rather, the judge observed that the public needed protection from the type of activity that occurred here and, under the particular circumstances of this case, from the defendant's anger and explosiveness. Furthermore, we find that there is an adequate basis in the record to support the court's comment that the defendant had an explosive personality. Specifically, a psychiatrist that testified for the defense stated that the defendant has a problem with his "impulses, as was evidenced at the time of the crime." The evidence further demonstrated that the defendant stabbed the victim in the back as the victim was on his hands and knees during a fight that began because one of the victim's friends threw a baseball bat at a vehicle containing some of the defendant's friends. It was reasonable for the court to conclude the defendant had an explosive personality. Thus, the trial court did not act arbitrarily when it denied the defendant's request for probation.

The defendant's final contention is that the trial court's sentence is excessive. The determination and imposition of a sentence involves considerable judicial discretion, and this court will not interfere with that determination unless it is shown that the trial court abused its discretion. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344; *People v. Flax* (1986), 147 Ill. App. 3d 943, 498 N.E.2d 667.) Voluntary manslaughter, a Class 1 felony, is punishable with a sentence of from 4 to 15 years' imprisonment. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—2, 1005—8—1(a)(4).) Defendant argues, as he did before, that there is no evidence to support the trial court's finding that the public needed protection from the defendant's explosive personality, that strong mitigating factors are present in this case, and, therefore, that the trial court abused its discretion by imposing a term of seven years. However, as we previously observed, there is more than adequate evidence in the record to support the trial judge's statement, and, furthermore, the trial court stated that at the time it im-

542

posed the sentence it had considered the mitigating factors present in the case. The court also stated that it had considered any aggravating factors that were present; the testimony and evidence introduced at trial; numerous reports, including the presentence report; and the testimony of psychiatrists and other witnesses presented at the sentencing hearing. Under all these circumstances, we cannot say that the trial court abused its discretion.

Accordingly, for the reasons stated above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.