THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DELMAR KOSYLA, Defendant-Appellant.

Second District   No. 83—1099

Opinion filed December 31, 1984.

Judith A. Halprin, of Chicago, and G. Joseph Weller and Jan K. Dargel, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Marlene V. Newton, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Delmar Kosyla, was charged by information in Lake County with two counts of aggravated battery, one for injuring Mark Beese by shooting him with a gun, and one for striking Glenn Beese, Jr., with a baseball bat. (Ill. Rev. Stat. 1983, ch. 38, par. 12–4(b)(1).) He was found guilty by a jury of the offense against Glenn Beese, Jr., but was acquitted of the shooting charge against Mark Beese. He was sentenced to 30 months' probation, with six months' incarceration in the Lake County jail.

The defendant contends (1) the court erred in proceeding on the second count of the information charging defendant with the aggravated battery of Glenn Beese because there was no evidence connecting him with that charge at the preliminary hearing and no finding of probable cause was made as to that count; (2) his guilt was not proved beyond a reasonable doubt; and (3) the court abused its sentencing discretion by including a jail term in his sentence of 30 months' probation.

The charges arose out of a neighborhood brawl during the early morning hours of July 7, 1983. It involved various members of the Kosyla, Potts, and Beese families, as well as several of their respective friends. The three families all lived on Marydale Drive in a Lake Zurich subdivision. There was evidence that the relationship between the Pottses and the Beeses on the one hand, and the Kosylas on the other hand, had been hostile at times during the preceding 2½ years.

The State presented evidence that on July 6, Mark Beese, Tom Carpenter, and Brian Post were at Horsing Around, a bar in Wisconsin. Mark worked there as the doorman and bouncer. At about 9 p.m., Mark received a call from Maria Monino, the daughter of Mrs. Potts. Maria was then the fiancee of Tom Carpenter, and was his wife at the time of trial. She told Mark that she had been in an altercation with Mr. Kosyla, the defendant's father, and that he had hit her. She called for Mark because she did not want to upset her fiance. The three young men left Horsing Around about midnight after Mark got off work. They drove to the subdivision in Lake Zurich, and Mark parked his car at his house. The three of them then walked to Potts' house to see Maria. It was about 1 a.m. when they arrived.

They saw Maria in her bedroom, and discovered she had two black eyes as the result of being struck by the defendant's father. Mrs. Potts, Carpenter, Mark Beese, and Phillip Monino (Mrs. Potts' son) testified they then heard rocks hitting the outside of the Potts' house and/or the utility shed in the backyard. Tom Carpenter ran out of the house, followed by Mark Beese and Brian Post. In the street in front of the Potts' property, they found the defendant, a friend of the defendant's

named Tim Anzalone, and the defendant's two younger brothers, Shane and Zachary. The defendant was holding a three-foot-long, rounded object, which Mark Beese described at trial as a metal baseball bat. Anzalone was holding a two-foot-long pipe. As the two groups confronted each other, Mark's older brother, Glenn Beese, Jr., ran toward the scene from the Beese house. The Beeses had been awakened by a phone call from Mrs. Potts during the rock-throwing incident.

Glenn Beese, Jr., observed Anzalone poised with the pipe raised, about to deliver a blow to Mark. He charged between them, and prevented Anzalone from landing the blow. As Glenn turned toward Mark to find out what was going on, he testified he was struck on the right shoulder and fell to the ground. Glenn testified he did not see who hit him but that, other than Anzalone, the defendant was the only one holding a long, shiny, metal-like object. After he was struck, Glenn testified he saw the defendant running toward the Kosyla house holding the same shiny object in his hand.

Glenn and the three others pursued the defendant's group to the Kosyla house, but Glenn fell down again before reaching the gate at the entrance to the Kosylas' driveway. Other evidence presented by the State concerned the shooting incident of which the defendant was acquitted, and for the most part it is not relevant to this appeal.

Although Lake County sheriff's detective Braze testified at the preliminary hearing that Mark Beese told him he saw the defendant hit Glenn with the baseball bat, Beese testified at trial he did not see who hit Glenn, denied he told Braze that he saw the defendant hit Glenn, and denied he recanted such a statement on the morning of the preliminary hearing. Detective Braze's testimony at trial was that Mark Beese told him he saw the defendant strike Glenn with a bat. After his recollection of his preliminary hearing testimony was refreshed with the transcript of that hearing, Detective Braze still did not recall Mark Beese changed his story about who hit Glenn. He recalled having a discussion with Mark the morning of the preliminary hearing, but did not recall Mark's saying it was not the defendant who struck Glenn. Detective Braze also testified to the search of the Kosyla residence, at which time a baseball bat was observed in the kitchen, leaning up against the refrigerator. The bat was not taken, but a .22-caliber pellet pistol was collected.

Another witness for the State who testified concerning the battery of Glenn Beese was Fredericka Potts, Maria Monino's mother. She testified she heard rocks being thrown on the roof of an aluminum shed in their backyard. She alerted the group downstairs in Maria's bedroom, and called the Beese residence. She looked out her front window to the

street, and testified she heard the defendant yell: "Come on over here, [obscenity deleted]." She went out on the porch and saw the defendant and another in the street; the defendant was wearing a white T-shirt and possibly jeans. He was holding a three-foot-long, round object, the exact nature of which she could not discern. The person with him was wearing dark clothing, and held a similar, long, round object, which was shorter in length than the one held by the defendant. She testified the lighting of the area at that time consisted of a floodlight on her garage that "goes right out to the road," and porch and garage lights at the Mochockis' house next door, and at the Kosylas', which was next to the Mochockis'. She observed Glenn come running up the road and described what happened:

"A. [Fredericka Potts] I know one guy, Tim, I believe his name is Tim, I know him from the gas station, he came with the object raising it up like this towards Mark. First Glenn went up and kind of stood in front of him and prevented him from going after Mark. All I remember is Glenn Beese turning like this and Delmar Kosyla went from behind like this and struck. him over the shoulder.

Q. [Prosecutor] Okay. And what did he strike him with?

A. With the round object I had seen.

Q. And how many times did he strike him, did you see?

A. To my knowledge, twice.

Q. And where in relationship to your body did he strike him?

A. This side (indicating); the right shoulder, on the back here."

During cross-examination, Mrs. Potts related her testimony concerning the above event twice more in approximately the same manner:

"A. [Fredericka Potts] I didn't see anybody else doing anything. Only thing I could see was Glenn Beese being struck as he turned to prevent—see, Delmar was standing there and this friend of his, like I said to Mr. Ritacca [the prosecutor], came towards him with a round object and Glenn Beese went up and tried to prevent him from going up to Mark. He was coming after Mark—

Q. [Defense counsel] And it was at that point—

A. —and as he turned, that's when Delmar took the baseball bat like this and struck him over the shoulder."

In the second instance, Mrs. Potts testified:

"A. [Fredericka Potts] I told you I saw Glenn running up the road then I saw him in front and I saw somebody come to-

wards him with a round object. It wasn't Delmar. He tried—it looked to me like he was going after Mark. I noticed Glenn Beese tried to prevent him from going—he stood like this and as he turned, that's when Delmar picked up the—had the baseball bat in his hand and he struck him.

Q. [Defense counsel] It was a baseball bat.

A. Well, no, it wasn't a baseball bat, I said a round object, you know, I never said what it was.

Q. Then you saw him strike him again, right? You saw Delmar strike him twice.

A. Yes, right. Right. It was right after it."

With regard to the two strikes by Delmar, Mrs. Potts testified the defendant struck Glenn once on the back of the shoulder and once again "more on the back." Glenn Beese recalled being struck only once. Doctor Michael Parker testified he examined both Mark and Glenn Beese after the incident. As to Glenn, the doctor observed he had some scrapes, and some swelling and tenderness over the right shoulder, "specifically over the joint called the AC joint." He also had some swelling and tenderness to the back of his right hand. Glenn received X rays, a prescription for pain and a sling. Cross-examination of the doctor dealt almost exclusively with his testimony concerning Mark's gunshot wound, and none of the doctor's testimony concerning Glenn's injuries was either impeached or elaborated upon.

The defense presented was that of defense of self, others and home. The defendant's mother, Joyce Kosyla, testified her family's relationship with the Pottses and Beeses was very uncomfortable between January and July of 1983, and that she and her family had been threatened many times by mail and on the phone.

At 1 a.m. on July 7, she was in the living room of her home. Sixteen-year-old Zachary, 11-year-old Elizabeth, and five-year-old Steven were sleeping. The defendant, his brother Shane, and defendant's friend, Tim Anzalone, were working on Mr. Kosyla's van in their detached garage. She was about to turn off the television, when she heard something banging against the closed farm-type gate which they had at the end of their gravel driveway. Looking out, she saw Mark Beese pushing at the gate with what appeared to be a club, possibly a baseball bat. He was with Glenn Beese and two others whose names she did not know. She called the police and watched the defendant proceed toward the Beese group, against her wishes, saying he had to help Tim. She heard firecrackers going off, and saw the defendant headed from the house back in the direction of the driveway. She identified pictures of the driveway gate at trial, one showing

a dent in the top rail of the gate, and the other depicting in a bent condition a long bar that slides through the gate to lock and close the gate. She testified the gate and bar were in good condition prior to July 7.

When she observed the Beese group, she testified she heard Mark Beese yell: "You [obscenity deleted], Delmar, I'm going to kill you," and that she heard the defendant yell to Tim: "Tim, let's get in the house." She said the defendant and Tim came into the house about four or five minutes after the defendant had told her that he had to help Tim. Although she said she called the police more than once during the incident, she testified the police did not arrive until 1½ to two hours later. The defendant and Tim told her they had thrown rocks and firecrackers at the Beese group.

Mrs. Kosyla also testified about an injury received by the defendant when he was at the Beese house about 10 months earlier, and about having received anonymous phone calls at various times. She recognized the voices of the anonymous callers to be either Mark Beese, Glenn Beese, Sr., or Phillip Monino (Mrs. Potts' son), and the defendant had also heard some of these anonymous calls by listening in on an extension phone. Mrs. Kosyla said the calls were not "social calls."

Although her attention was not directed solely to the presence of the boys in the garage, she did not hear them leave at any time. The last time the defendant came to the back door to ask her to give him a coke was about an hour before the incident.

The defendant testified on his own behalf and denied either shooting Mark Beese or striking Glenn Beese, Jr. Initially very close to the Beese family, the defendant claimed that relations with them had changed after he testified during the summer of 1982 about an automobile accident involving Mark Beese. After giving his testimony in that case, Mark confronted the defendant outside the courtroom and, in the presence of the other person involved in the auto accident, told him that he was going to kill him. The defendant was five feet nine inches tall and weighed 145 pounds; he admitted he was frightened of Mark Beese, who was six feet four inches tall and weighed 250 pounds or more. The defendant and Mark both were wrestlers, but Mark was in the heavyweight class. The defendant testified to several instances of conflict with members of the Beese family; one confrontation required him to get between nine and 12 stitches after being struck in the face and eye with a screwdriver by Mark.

On July 7, 1983, about 1 a.m., the defendant testified he was working in his family's garage and his friend Tim was helping him on

and off throughout the evening. He testified that he heard rocks hitting his van and someone trying to enter his driveway gate. Tim went to see what was happening, and when the defendant looked, he saw Mark Beese swing a bat at Tim's head. Fearing for himself, his family and Tim, the defendant threw rocks from his gravel driveway at the group of people, including Mark, and he believed he did, in fact, hit Mark with some of the rocks. The defendant and Tim then went into the defendant's house and stayed there.

On cross-examination, the defendant denied he told Officers Mulder and Braze that Tom Carpenter had brandished two large knives during the incident. On the occasion of the injury requiring stitches, the defendant testified he did not remember swinging a hammer at Mark Beese or picking up and throwing patio furniture at him. He stated Tim Anzalone was throwing firecrackers on and off all evening on July 7. He denied either he or Tim had anything in his hands that night. He testified he did not see Glenn get hit, and that he saw Tom Carpenter holding a long, but indiscernible, object. He testified that although he was afraid on July 7, using a gun on the Beese group had not crossed his mind. Contrary to the State's evidence, the defendant testified that the Beese group did trespass onto the Kosyla property.

Defense witnesses Randall Ricci, Randall Manuel, David Krizanovic, and John Diener testified to several instances in which the defendant and, on occasion, the witness as well, had been attacked verbally and/or physically by Mark or other members of the Beese family, and that Mark's reputation was one of violence. Randall Ricci and Randall Manuel testified that Glenn Beese, Jr., was also known to be violent.

Mrs. Mochocki, who lived in the house between the Pottses and the Kosylas, testified that on July 7 about 1 a.m. she heard someone in the group that Mark Beese was with say: "I don't care who that [obscenity deleted] is he can't go around hitting women." She also testified she later heard three or four gunshots, and saw a split-second "afterglow" of the gunshot, which was pointing from the area of the Kosyla house toward the direction of the street. She testified she had been awakened by the noise coming from the group of people in front of her house, referring here to the group of people which included Mark Beese. She said the group was standing there, and was not moving in any direction until someone jumped over the Kosyla fence. When that happened, a couple of people in the Beese group proceeded to leave. She stated she did not hear firecrackers before she heard three shots, and that it was only a few minutes after some-

one jumped over the Kosyla fence that she heard the gunshots.

### 1. Propriety of Prosecution for the Aggravated Battery of Glenn Beese, Jr.

The defendant was originally charged by complaint filed on July 7 with the aggravated battery of Mark Beese in that he shot him with a gun. The preliminary hearing was held and probable cause was found. The only witness was Detective Thomas Braze of the Lake County sheriff's department. He testified Mark Beese told him that one of the persons who was with the defendant produced a pipe and hit his brother, Glenn Beese, Jr., on the shoulder, causing him to drop to the ground. Mark said it happened when he was standing right there next to his brother. He said he was engaged in conversation with the defendant, and that there was some hollering going back and forth. After Glenn was hit, the defendant ran back to his house and came out with a gun, pointed the gun in the direction of the Beese group, and fired at least three times.

On cross-examination, the detective stated that he had told a newspaper reporter that it was Delmar Kosyla who struck Glenn Beese. He testified that report was based on his interview with Mark, but that as of the morning of the preliminary hearing, when he talked with Mark before the hearing, Mark changed his story and said that someone else other than the defendant struck his brother with a pipe. As noted earlier, at trial the detective did not recall testifying at the preliminary hearing that Mark had changed his story about who hit Glenn. The detective's lack of recall is not as unlikely as it may seem, when it is considered that the preliminary hearing was being conducted on the basis of only the initial charge against the defendant for the shooting of Mark Beese. In any case, the State filed the two-count information charging the defendant with one count each of aggravated battery of Mark Beese and Glenn Beese, Jr.

The defendant contends he was deprived of his constitutional right to a probable-cause determination on count II of the information (charging the aggravated battery of Glenn Beese) because not only was no evidence presented at the preliminary hearing to support a finding of probable cause as to that charge, but there was in fact positive evidence to the contrary that someone *other* than he had struck Glenn Beese, Jr. Further, he contends the second charge cannot be considered to have arisen from "the same transaction or conduct of the defendant" which formed the basis for the first charge and for which probable cause was properly found to exist. He concludes it was error for the court to proceed with his prosecution on a charge which

had not been properly commenced either by indictment or by information upon a finding of probable cause after a preliminary hearing.

The State correctly points out that the defendant's argument is incorrectly premised on the fact the preliminary hearing was held *after* the two-count information was filed, whereas the fact is the second count was added about two weeks after the preliminary hearing was held.

The State argues the second count was proper under section 111—2(f) of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1983, ch. 38, par. 111—2(f)). That section provides:

"Where the prosecution of a felony is by information or complaint after preliminary hearing, or after a waiver of preliminary hearing in accordance with paragraph (a) of this Section, such prosecution may be for all offenses, arising from the same transaction or conduct of a defendant even though the complaint or complaints filed at the preliminary hearing charged only one or some of the offenses arising from that transaction or conduct."

The defendant argues that the two charges did not arise out of the same transaction or conduct of the defendant because they involved different victims, were separated by time and distance, and "even some of the eyewitnesses to the two events were different."

It has been established that before prosecution for a felony by way of information may be commenced, a defendant is entitled to a probable cause determination. (Ill. Const. 1970, art. I, sec. 7.) Specifically, that section provides in pertinent part:

"No person shall be held to answer for a crime punishable by death or by imprisonment in the penitentiary unless either the initial charge has been brought by indictment of a grand jury or the person has been given a prompt preliminary hearing to establish probable cause."

■■ The purpose of a preliminary hearing is to insure that a person charged is not held in custody or to bail without a showing of probable cause; the constitutional right involved is the right not to be unduly detained. (*People v. Anderson* (1981), 92 Ill. App. 3d 849, 850; *People v. Moore* (1975), 26 Ill. App. 3d 1078.) Here the defendant was arrested pursuant to a valid warrant and held, on bond, pending the filing of an information after a preliminary hearing in which probable cause was found that the offense of aggravated battery against Mark Beese had been committed, and that the defendant committed it. The defendant does not contend he was unduly detained on the initial charge. Section 111—2 of the Code represents the codification of the

constitutional mandate in article I, section 7. Ill. Rev. Stat. 1983, ch. 38, par. 111—2.

The court in *People v. Redmond* (1977), 67 Ill. 2d 242, *cert. denied* (1978), 434 U.S. 1078, 55 L. Ed. 2d 785, 98 S. Ct. 1272, sustained the validity of the provision of section 111—2 which is at issue here, subsection (f). The *Redmond* court held that neither the Illinois Constitution nor the due process clause required a probable cause determination for each separate charge where the subsequently charged offense arose from the same transaction or conduct. The defendant claims the two "incidents" which are the subject of the two aggravated battery charges were separate and distinct, they involved two different complainants, were separated by time and distance, and some of the eyewitnesses to the two events were different. Such considerations, however, are more apropos to the "one act/one crime" analysis which is undertaken in order to prevent prejudicing a defendant by carving more than one offense out of one act. (See *People v. King* (1977), 66 Ill. 2d 551, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.) The focus of the preliminary hearing, however, is to determine whether the evidence presented shows conduct by the defendant for which he may reasonably be believed to be criminally responsible.

Although the State suggests it was "curious" the defendant did not object to joinder of the offenses in separate counts of the information as permitted by section 111—4 (Ill. Rev. Stat. 1983, ch. 38, par. 111—4), there is no authority for construing such a failure to operate as a type of waiver of the issue now sought to be raised, especially since the defendant raised the issue of the subsequent charge in the absence of a second preliminary hearing both before and after trial. The State's analogy between sections 111—4(a) and 111—2(f) is not without some cogency, however.

Section 111—4(a) of the Code provides in pertinent part:

"Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." Ill. Rev. Stat. 1983, ch. 38, par. 111—4(a).

As noted by the State, the important factors to consider in determining whether offenses are part of the same comprehensive transaction for purposes of joinder are their proximity in time and location, and the identity of evidence which would be presented to prove each charge. (*People v. Mikel* (1979), 73 Ill. App. 3d 21, 27; *People v. Freeland* (1981), 103 Ill. App. 3d 94, 98.) In making the deter-

mination whether to join or sever offenses, there is necessarily some uncertainty as to the third factor, the identity of the evidence to be presented. In determining whether section 111—2(f) has been properly applied in a given case, however, there is less room for uncertainty, since evidence establishing probable cause for the initial charge has already been presented at the preliminary hearing.

We believe a reasonable construction of the phrase all offenses "arising from the same transaction or conduct of a defendant" within the meaning of section 111—2(f) is that any offenses shown by the evidence presented at the preliminary hearing may be prosecuted even though such offenses were not initially charged at the time the preliminary hearing was held. Support for this construction is evident in the *Redmond* case, wherein the court reversed the circuit court's dismissal of an attempted murder count filed against the defendant subsequent to his preliminary hearing, at which time he was charged only with aggravated battery. (*People v. Redmond* (1977), 67 Ill. 2d 242, *cert. denied* (1978), 434 U.S. 1078, 55 L. Ed. 2d 785, 98 S. Ct. 1272.) The *Redmond* court pointed to a provision in the California Penal Code similar to our section 111—2(f), noting it had been held constitutional, and the effect of that decision was construed in *People v. Evans* (1952), 39 Cal. 2d 242, 249, 246 P.2d 636, 640, to wit:

> " 'The effect of the court's declarations of the constitutional operation of the section was to approve the filing of an information *charging a different but related crime shown by the evidence* taken before the magistrate bearing on the transaction involved in the commitment order.' " (Emphasis added.) *People v. Redmond* (1977), 67 Ill. 2d 242, 249, *cert. denied* (1978), 434 U.S. 1078, 55 L. Ed. 2d 785, 98 S. Ct. 1272.

We find no merit in defendant's argument that section 111—2(f) should not be applied here because the preliminary hearing evidence showed Glenn Beese, Jr., was hit by someone who was with the defendant, not by the defendant himself. In context, the evidence presented at the preliminary hearing was sufficient to establish probable cause to believe the defendant was at least accountable for the other "someone's" act of hitting Glenn Beese, Jr. (Ill. Rev. Stat. 1983, ch. 38, par. 5—2.) Further, it has been held that an accused may properly be charged as a principal even though the proof is that the accused was an accessory who aided or abetted the crime. *People v. Williams* (1975), 28 Ill. App. 3d 402; *People v. Fowler* (1974), 18 Ill. App. 3d 489.

In a somewhat analogous factual situation, the court in *People v. King* (1973), 14 Ill. App. 3d 995 (abstract of opinion), found the State

proved beyond a reasonable doubt in an aggravated battery prosecution that the defendant was legally accountable for the conduct of the codefendant where, *inter alia*, the State established that the defendant engaged a member of a rival street gang in a conversation and led the conversation to an argument which culminated in the codefendant's shooting the rival gang member, where the defendant remained in the codefendant's company after the shooting and pursued the victim and his companion, and where he fled the scene with the codefendant. As the preliminary evidence here showed, the defendant was engaged in conversation with Mark Beese, and there was some "hollering back and forth." At that time, Mark Beese said that one of the people who were with the defendant produced a pipe and hit Glenn. Immediately thereafter the defendant ran back into his own house, came right back out with a gun in his hand and fired three times at the group composed of Mark and Glenn Beese, Tom Carpenter and Brian Post.

We conclude the defendant was not deprived of any constitutional right, and there was no error in his prosecution under the two-count information.

2. Reasonable Doubt.

Defendant contends he was not proved guilty beyond a reasonable doubt because the State's evidence was contradictory, not credible, and conflicting. In particular, he asserts the testimony of Fredericka Potts, the only State witness to positively identify him as having struck Glenn Beese, Jr., was not credible in view of her admitted dislike of the defendant and the on-going neighborhood dispute, her testimony was contradicted by other State witnesses on crucial points, and her opportunity to clearly observe the incident was limited due to the lighting conditions in the area.

The defendant finds Potts' testimony strikingly inconsistent with that of the other witnesses who were involved in the affray concerning where Glenn Beese was when he was struck, and refers to that part of the record where, defendant claims, "Mrs. Potts testified that Glenn was no more than two to three feet from the Kosyla property putting him at least 130 feet from her driveway." Defendant acknowledges that while other evidence may support the conclusion that Glenn was at one time within a few feet from the Kosylas' property and may have fallen down there, "Potts is the only witness to claim that he was struck there."

The record shows the part cited by the defendant is taken out of context and that Mrs. Potts' response was an obvious misunderstand-

ing of the question. Potts' testimony unequivocally and consistently was that the two groups faced each other in the street in front of her home, which was two doors from the Kosylas' property. The Mochocki house was in between. Potts testified she looked out of her living room window toward the street, and that the living room window was about 20-25 feet from the street. She heard Delmar (the defendant) yelling words to the effect, "Come on over here, you [obscenity deleted]." She had a big floodlight on her garage which "goes out to the road"; the Mochockis had a big floodlight on their front porch and one on their garage in back. The "big light" from the Mochocki house that shined out into the street was a regular street light: "the kind you see on public streets." The Kosylas' porch light by the door and their garage light was on also. The Kosylas had "the same kind of light the Mochocki's had." The defendant was wearing a white T-shirt and the other person had on dark clothes. Potts then went outside on her front porch and had an unobstructed view from there out to the street where the defendant and the other person were standing. She saw the defendant holding a three-foot long round object. She testified she did not know what the nature of the object was, even though she did refer to it during her testimony on occasion as a baseball bat. Several other witnesses referred to the "round object" as a baseball bat, as well, but they all qualified their answer that they did not really know what the object was. Mark Beese was the only one who unqualifiedly testified that the object the defendant was holding was a metal baseball bat.

Mrs. Potts testified Tom Carpenter was the first one who went out into the street in response to the defendant's yells, followed by Mark Beese and Brian Post. She went back inside the house and called the Beeses. She then saw Glenn Beese coming running up the road toward his brother, Mark. She then testified to the striking of Glenn Beese, Jr., and testified at least twice more to the same sequence of events on cross-examination. At no time prior to her testimony about Glenn's being struck did she indicate that the group was anywhere but in the street about 20-25 feet in front of her house. The colloquy on which the defendant bases his claim that Potts testified Glenn was struck two to three feet from the Kosylas' house reads as follows:

"BY MR. RITACCA [Prosecutor]:

Q. Now, as a result of being hit with this round object, what if anything did Glenn do?

A. [Mrs. Potts] I noticed Glenn went down, kind of went down, tried to get up and fell again. Then I noticed he just fell.

Got back up.

Q. Did you see Glenn walk toward the Kosyla house at that time?

A. Yes, he was on the corner of the entrance to—

Q. Okay. And approximately from where he got hit to the Kosyla house is how far?

A. (No response.)

Q. In feet.

A. Oh, not more than two or three feet.

Q. Two or three feet?

A. That's how far he went.

Q. And at this time where did you see Delmar go, if any place?

A. He jumped over the fence. They have like this steel gate which was closed, he jumped over it and ran in the house."

In context, the colloquy suggests that the questioner and the witness were not quite understanding each other. Further, if indeed Glenn was struck two to three feet from the Kosylas' house, Mrs. Potts' further testimony that the defendant then jumped over the steel gate makes no sense, since the steel gate was at the end of the Kosylas' driveway and he would have been moving away from the house rather than toward the house. The 130-foot dimension referred to by the defendant in his brief represents the approximate distance between where Mrs. Potts was in her front yard to the Kosyla house as she looked away from the street to her side toward the Kosyla house. Further, she testified consistently with several other State witnesses that the Beese group did not go all the way to the Kosylas' property, but stopped short of there, placing them in the street in front of the intervening Mochocki property.

The group's presence in the street at that location at the time the shots were fired from the direction of the Kosyla house toward the street was also corroborated by Mrs. Mochocki, a witness for the defense, and one of the neighbors who was uninvolved in the hard feelings existing between the Pottses and Beeses and the Kosylas. She clearly recognized Mark Beese as one of the people in the group in the street in front of her house, and heard one person in the group say, "I don't care who that asshole is he cannot go around hitting women."

Testimony of the State's witnesses that the Beese group did not enter onto Kosyla property is in sharp contrast to the testimony of the defendant. He testified that the Beese group was trying to get through Kosylas' driveway gate, and that Mark and the others in that

group were on the Kosyla driveway moving in the direction of the house. Defendant further testified that he was afraid for himself, his house, and the other members of his family, and that he threw a handful of rocks at Mark before Tim "dragged" him back into the house, and that he did not go back outside. Defendant denied both the shooting of Mark and the striking of Glenn Beese. Mrs. Mochocki testified, however, that she heard three or four loud sounds and that after each such sound she saw "afterglow" of the shot which was pointing toward the street from the area of the Kosylas' house. The Kosyla property was 50 feet from where she was looking out her window, and she testified that she had a clear view.

Although Mark Beese was unable to state at trial who struck his brother, the record indicates his attention was focused on his brother who, at the time he was struck, was turning toward Mark to seek an explanation of what was going on, and the defendant came up from behind Glenn and struck him. Glenn was also unable to testify who hit him. However, his testimony was that the defendant was standing a distance behind Tim Anzalone, that Anzalone dropped the pipe he was holding when Glenn intervened between him and Mark, and that he (Glenn) picked up the pipe and threw it to the side. With Anzalone thusly disarmed, Glenn's further testimony that he saw no one else except the defendant holding a long, rounded object presents strong circumstantial evidence corroborative of Mrs. Potts' direct testimony that it was the defendant who struck Glenn. Mrs. Potts had ample opportunity and ability to recognize the defendant, particularly since he was wearing a white T-shirt whereas Tim Anzalone was wearing dark clothing.

The fact of Mrs. Potts' dislike for the defendant, although a factor to be considered in judging her credibility (*People v. Quintana* (1968), 91 Ill. App. 2d 95), was fully presented to the jury by defense counsel's extensive, detailed cross-examination, and it was the jury's province to weigh her testimony in light of that exposed bias. Although a reading of Mrs. Potts' testimony contained what appears at times to be inherent contradictions, she nevertheless unwaveringly adhered to the same version of the sequence of events surrounding the striking of Glenn even under rigorous cross-examination.

That Mrs. Potts may have confused some of the details of the event may indeed be attributed to defense counsel's strong cross-examination style. The court, in fact, commented twice in chambers about counsel's cross-examination:

"THE COURT: If you do what I tell you, you won't badger her. You are a very competent attorney, but you pounce on her.

I don't want to make it look like I'm on one side or the other out there, but—you are very competent, counsel, you are doing a good job, you broke a witness down. But please don't be unprofessional about it. I expect you to do your job and to represent your client, and you know what I mean. You have really put this witness through it by your machine gunning questioning. I've let you get away with it so far, but if it continues—you must give her time to answer and you must use an ordinary tone of voice."

Later, in denying defense counsel's request to be allowed to impeach Mrs. Potts' credibility with evidence of prior testimony which was given inconsistently by her in two other causes involving Mr. Kosyla, the court commented in part:

"THE COURT: I don't need any more, counsel. I've observed the witness and in the manner you question her, she could get confused."

Mrs. Potts' testimony that Glenn was struck twice and Glenn's own testimony that he was struck once on the shoulder presents only a conflict in the evidence to be resolved by the jury. The number of blows amounts only to a discrepancy in a collateral matter, which does not render Mrs. Potts' testimony improbable or incredible. *People v. Winfield* (1983), 113 Ill. App. 3d 818.

█ ■ It is the general rule that minor inconsistencies and discrepancies in the testimony of a witness do not render the testimony unworthy of belief and affect only the weight to be given the testimony. (*People v. Roper* (1983), 116 Ill. App. 3d 821.) It is the jury's prerogative to weigh testimony in light of its discrepancies and conflicts, to accept or reject as much or as little of the witness' testimony as it pleases, and to draw reasonable inferences from that testimony. (*People v. Hanna* (1983), 120 Ill. App. 3d 602.) The jury's determination in this regard should not be disturbed upon review unless it is so contrary to the evidence as to raise a reasonable doubt of the defendant's guilt. (*People v. Banks* (1984), 121 Ill. App. 3d 279.) The basis for the jury's determination here was not so restricted to Mrs. Potts' direct testimony, but included considerable circumstantial evidence which corroborated it. The State may prove its case by circumstantial as well as direct evidence. *People v. Daniels* (1983), 113 Ill. App. 3d 523.

█ The evidence was not so unsatisfactory as to raise a reasonable doubt of the defendant's guilt, and the jury's verdict should remain undisturbed.

### 3. EXCESSIVE SENTENCE.

The defendant lastly contends the sentence imposed was excessive and constituted an abuse of discretion by the trial court. He argues there is no support for the court's determination that it could not conclude that he would be unlikely to commit another crime. He notes that even though the general rule is that a judicial determination of the weight to be accorded the various sentencing factors will usually be upheld, nevertheless there must be support in the record for such a determination. (*People v. Lewis* (1980), 89 Ill. App. 3d 15.) As evidence his conduct would not be likely to recur, he points to the fact his family moved from Lake Zurich to Evanston and, further, since his conduct was apparently the result of the neighborhood dispute, his incarceration was not warranted for purposes of protection of the public. Nor was it, he argues, a particularly "serious" offense, in view of the fact the complainant failed to respond to and to return the victim-impact questionnaire, and the presentence report indicated the incident was the result of "mere youthful impulsiveness." We note here that that characterization of the presentence report is misleading, since it was actually the prosecutor during argument who interpreted the presentence report as depicting the incident as nothing more than "mere youthful impulsiveness," a characterization with which the prosecutor stated he did not agree. The defendant further notes in his argument that even the State concluded imprisonment would "devour and would pray [*sic*] on [defendant's] spirit and body." The defendant requests his jail sentence be vacated or, alternatively, that he be resentenced.

■ Aggravated battery is a Class 3 felony, the sentence for which may be probation including a possible jail sentence of up to six months, or a prison term of no less than two and no more than five years. (Ill. Rev. Stat. 1983, ch. 38, pars. 12—4, 1005—6—3(d) and 1005—8—1(a)(6).) The court did not abuse its discretion in sentencing the defendant to 30 months' probation with a six-month jail term. The record, in fact, shows the court would have imposed a prison term of between two and three years, but for the State's and the defendant's requests for leniency. Further, although the judge stated he felt probation would probably deprecate the seriousness of the crime, he nevertheless acceded to the parties' pleas and imposed probation, lawfully including as a condition, however, a six-month jail term. On this record, the six-month jail term appears to have been not much more than a palliative for the judge's deep concern that probation alone was too lenient for this defendant.

As the State points out, the defendant has misconstrued the

court's comments. The court did not disallow the mitigating effect of the defendant's move to Evanston on the potential for recurrence of the *circumstances* which resulted in the defendant's conduct. Rather, the court stated it could not agree that the defendant's *character* and *attitude* indicated it was unlikely he would commit another crime. Clearly, the trial court's assessment of the defendant in that regard was the result of its observation of the defendant and his demeanor in court, and this court has neither the authority nor the means to second-guess the trial court in that regard.

The defendant asserts that because the court apparently considered, but discarded, the mitigating factor that the defendant would be unlikely to commit another crime, it must necessarily have completely ignored the statutory mitigating factor that the crime was the result of circumstances unlikely to recur.

Although nothing specifically in the record provides an indication that the defendant would be likely to commit another crime, the trial court's judgment depends upon many factors including, *inter alia,* a defendant's credibility, demeanor and mentality, and the assessment of those factors is uniquely within the province of the trial judge. (*People v. Cozzi* (1981), 93 Ill. App. 3d 94.) Additionally, it is clear the court was presented with evidence that the defendant and his family had moved, presumably making it unlikely that the animosity between the Beese, Potts, and Kosyla families would erupt again into physical violence. In the absence of any evidence the court ignored this mitigating factor, it is presumed the court did consider it. *People v. Baker* (1983), 114 Ill. App. 3d 803.

The record here shows not only a proper exercise of the trial court's discretion, but an uncommonly good example of the effect the court's aggravation-mitigation balancing process can have on the sentence ultimately imposed. The prime responsibility for striking the proper balance between the seriousness of the offense and the offender's rehabilitation potential belongs to the trial court. *People v. Bergman* (1984), 121 Ill. App. 3d 100.

The trial court did not abuse its sentencing discretion, and where no abuse of discretion is shown, no alteration of the sentence imposed is permissible. *People v. Rosa* (1982), 111 Ill. App. 3d 384; *People v. Cox* (1980), 82 Ill. 2d 268.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

LINDBERG and SCHNAKE, JJ., concur.