THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ZACHARY WOODARD, Defendant-Appellant.

Fifth District   No. 5—90—0471

Opinion filed March 13, 1992.—Rehearing denied April 14, 1992.

Daniel M. Kirwan and Edwin J. Anderson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Kenneth R. Boyle, Stephen E. Norris, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

The defendant, Zachary Woodard, was charged with aggravated battery and armed violence based on aggravated battery. On May 17, 1990, a jury found the defendant guilty of the crimes charged. His motion for a new trial was denied, and he was sentenced on July 12, 1990. The court vacated the aggravated battery conviction and imposed a nine-year sentence of imprisonment for the armed violence conviction. The defendant contends that there was insufficient evidence presented to prove him guilty beyond a reasonable doubt and that the trial court improperly excluded a corroborating alibi witness for the defendant, thereby denying him a fair trial. We affirm.

The victim, Willie Spates, testified that on January 21, 1990, he was at the house of Lamont Wells in East St. Louis with his brothers, L.C. and Donnie Spates. The four men, according to his testimony, began drinking about 6:30 p.m. that evening consuming some

wine, gin and beer over a period of approximately five hours. Sometime before midnight Emmell Taylor, Lamont Wells' grandmother, asked the young men to leave because they were making too much noise. Willie Spates testified that he and his brother L.C. left the house, headed down to a liquor store owned by Chester Haymore, and bought some chicken on the way. Willie sent his brother in to buy the beer because he was not welcome in Mr. Haymore's store. While waiting for L.C., Willie was approached by his friend, Anthony Cooper. Cooper, according to Willie Spates, offered to buy four pieces of chicken from him for $4 and also offered him a pair of earrings. After the exchange, Willie sent his brother back in to buy more beer with the money. The three men then proceeded to walk back to Lamont Wells' house. As the men were walking up the street, Willie Spates and Anthony Cooper were in front while L.C. trailed farther behind. Willie testified that he heard a voice say, "Don't you remember this?" Willie Spates recognized the voice as that of the defendant, Zachary Woodard. At that moment a shot rang out. The bullet passed through Willie's right arm and lodged in his chest. Willie Spates turned and claimed he saw the defendant standing at the curb across the street. He estimated the distance at about 40 feet and said the area was lit by a street lamp. He testified the defendant was holding a pistol. As more shots rang out Willie Spates ran to the house of Lamont Wells. He pushed in the door, ran through the home and up into the attic. He was later taken to the hospital where he identified the defendant as the man who shot him. Willie Spates claimed that several months prior to the incident the defendant had accused him of stealing his food and had threatened to shoot him for it. Spates testified that he had also seen a man named Cortez Prater at the scene.

Crime scene technician William Brandon and Detective Marion Hubbard spoke to Willie Spates at the hospital at about 1:30 a.m. that evening. They said he appeared to have been drinking, but did not seem drunk and was not out of control.

Officer Hubbard took statements from several witnesses of the crime. Anthony Cooper stated that he could not say the defendant had done the shooting because Cooper had covered his head when the incident occurred and then took off running. In his statement to the police, Cortez Prater said that he had seen the defendant argue with the Spates brothers, run back into the poolroom, come out of the poolroom with a revolver, and shoot the Spates brothers. Hubbard also took a statement from Chester Haymore. Haymore said in

the statement that the defendant did not enter his poolroom until a few minutes before the shooting was reported by a girl.

At trial the witnesses' testimony varied dramatically from their statements. Anthony Cooper testified that on the night of the shooting he had been standing in front of the liquor store when he saw Willie and L.C. Spates coming down the street. Cooper said that he offered to trade a pair of earrings he had for some of Willie Spates' chicken. He denied that any money was exchanged. As he and Willie Spates walked down the street followed by L.C., a small young man around 17 or 18 ran out of the dark carrying a .22 rifle and said, "Spates, why you do that to me like that?" At this point Willie Spates took off running to Wells' house. Cooper testified that he said, "I ain't got nothing to do with it, man," at which point the assailant responded, "I know Cooper." Anthony Cooper identified this smaller man as "Willie," a janitor at a local school, but did not know his full name. Cooper said that as he ran home he heard more shots fired at L.C. Spates. He testified that he had not seen the defendant on the street that night. At trial Anthony Cooper insisted that he had tried to tell the police about "little Willie," but that he was pressured and threatened by Officer Hubbard into signing the statement without knowing what it said.

After this testimony the State requested a short continuance to locate "little Willie," subpoena him, and have him testify. The court denied the request.

Cortez Prater testified at trial that, contrary to his statement, he had not witnessed the shooting. He claimed that Detective Hubbard had threatened him and that he signed the statement only because he was scared and wanted to go home.

Chester Haymore testified that he owned the poolroom and the adjacent liquor store. At trial he said that he saw the defendant enter the pool hall sometime after 9 or 10 p.m. on the night of the shooting. He claimed that the defendant was playing pool with a man named "Bear" when a girl ran in and announced that there had been a shooting. Haymore said he told the defendant to close and bar the door at which time the defendant answered the phone just inside the door. Mr. Haymore testified that his statement to Detective Hubbard was inaccurate to the extent it indicated he had seen the defendant enter the pool hall only minutes before the shooting was reported.

The defendant testified at trial that he had gone to Haymore's Pool Hall that evening. While he was there shooting pool with a man named Tyrone, nicknamed "Bear," the telephone rang. The

defendant answered it and found it was Carrie Williams calling, a friend of his who lived down the block from the pool hall. Just after he finished speaking on the phone, a woman entered the hall saying that two men had been shot nearby. Mr. Haymore, the defendant said, told him to bar the door, and shortly after this Carrie Williams called again asking him to come over to her house as the shooting had occurred near her home. Defendant went to her home immediately after the call. As the defendant was standing at the scene of the shooting talking with police detective Levy, a call came in to arrest Zachary Woodard as a suspect in the shooting. The officer then placed the defendant under arrest. While the defendant denied having a gun that night or having seen the shooting, he did say that he had told Willie Spates not to hang out in front of the pool hall that evening.

Carrie Williams also testified. She said that on the night of the shooting she and her children got down on the floor of their home when they heard the shots. She then telephoned the pool hall to find out what was happening. The defendant answered the phone and she spoke with him. After hanging up she heard another gun shot and called the pool hall again. She testified that she thought she had called a third time as well.

Before the close of their case, the defense attempted to call Raymond Tyrone Livingston, nicknamed "Bear." Livingston was allegedly the man who had been playing pool with the defendant the night of the shooting. The State objected on the basis of surprise as the witness was not named in discovery, and the court sustained the objection. The defense made an offer of proof that the witness would testify that he had been playing pool with the defendant for a period of hours before the shooting was reported.

The defendant first alleges that the evidence presented by the State was inadequate to prove him guilty beyond a reasonable doubt since the defendant's alibi was corroborated, witnesses testified that their statements to police were untrue and coerced, and the victim's ability to identify the defendant was doubtful.

When presented with a challenge to the sufficiency of evidence, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) The night of the shooting and at trial, Willie Spates, without hesitation, identified the defendant as the man who shot him. Testimony of a single witness, if positive and credible,

may be sufficient to sustain a conviction even though the testimony is contradicted by the accused. (*People v. Mehelic* (1987), 152 Ill. App. 3d 843, 850, 504 N.E.2d 1310, 1315.) While there was evidence to suggest that the victim's opportunity to observe the defendant was less than ideal, the sufficiency of identification testimony is a question of fact for the jury to decide (*People v. Palmer* (1984), 125 Ill. App. 3d 703, 709, 466 N.E.2d 640, 645). It is not the function of this court to retry the defendant. *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.

■ The testimonies of Anthony Cooper, Cortez Prater, and Chester Haymore were all contradicted to one degree or another by their pretrial statements to the police. It is the jury's prerogative to weigh testimony in light of its discrepancies and conflicts, to accept or reject as much or as little of the witnesses' testimony as it pleases, and to draw reasonable inferences from that testimony. (*People v. Kosyla* (1984), 129 Ill. App. 3d 685, 701, 472 N.E.2d 1207, 1218.) The pretrial statements given by these men implicated the defendant at least as much as their testimony at trial exculpated him. This court will not substitute its judgment as to the weight of disputed evidence or the credibility of witnesses. *People v. Collins* (1988), 176 Ill. App. 3d 169, 173, 530 N.E.2d 1143, 1146.

■ As regards the defendant's alibi, it must be noted that a jury is never required to accept alibi testimony over the positive identification of the accused even if the alibi testimony is given by a greater number of witnesses. The jury is in a superior position to observe the witnesses and consider their interest in exonerating the defendant. (*Palmer*, 125 Ill. App. 3d at 711, 466 N.E.2d at 647.) Thus, after viewing the evidence in a light most favorable to the prosecution, we cannot say that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The defendant also argues that he was denied a fair trial when the court, over objection, refused to allow the defense to call Raymond Tyrone Livingston as a witness to corroborate the defendant's alibi.

■ Supreme Court Rule 413(d)(i) requires that defendant disclose prior to trial a list of the witnesses that defendant intends to call. (134 Ill. 2d R. 413(d)(i).) Failure to comply with this disclosure requirement subjects the defendant to the possibility of sanctions, including the exclusion of an undisclosed witness. 134 Ill. 2d R. 415(g).

■■ It is undisputed that Livingston was not listed in discovery as a possible witness by the defendant. It is reasonable to presume that there is something suspect about a defense witness who is not identified until after the eleventh hour has passed. (*Taylor v. Illinois* (1988), 484 U.S. 400, 414, 98 L. Ed. 2d 798, 813-14, 108 S. Ct. 646, 655.) There is no apparent reason why Livingston could not have been listed as a possible witness for the defense, even if only as "Bear." Properly conducted discovery minimizes the risk that a judgment will be predicated on incomplete, misleading or even deliberately fabricated testimony. (*Taylor*, 484 U.S. at 411-12, 98 L. Ed. 2d at 812, 108 S. Ct. at 653-54.) Defendants who are willing to fabricate a defense may also be willing to fabricate excuses for failing to comply with a discovery requirement. (*Taylor*, 484 U.S. at 413, 98 L. Ed. 2d at 813, 108 S. Ct. at 655.) The record also suggests that Livingston's testimony was cumulative as, at trial, the defendant, Chester Haymore and Carrie Williams all gave testimony supporting the defendant's alibi that he was in the pool hall at the time of the shooting; therefore, no prejudice was shown.

Whether or not to impose the sanction of exclusion is a matter within the trial court's discretion, and the trial court's decision will not be disturbed absent a showing of prejudice or surprise. (*People v. McKinney* (1983), 117 Ill. App. 3d 591, 596, 453 N.E.2d 926, 929.) The defendant can claim no surprise and has failed to show any prejudice. We therefore will not disturb the trial court's decision.

While the defense has correctly pointed out that the exclusion of a witness in *Taylor* was based upon a showing of willful discovery violation, they incorrectly presume that *Taylor* precludes all other grounds for such exclusion. They mistake *Taylor*'s specific holding for a broader standard.

Affirmed.

GOLDENHERSH, P.J., and LEWIS, J., concur.