THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL GOODLOE, Defendant-Appellant.

First District (6th Division)    No. 1—90—1490

Opinion filed June 10, 1994.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Diane Meyer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant Michael Goodloe was found guilty of first degree murder of William "Red" McKinney and was sentenced to 23 years' imprisonment. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt; that the trial court erred in not allowing him to show that the deceased had alcohol in his body; and that he was denied effective assistance of counsel. The pertinent facts follow.

At trial, Diane McKinney testified for the prosecution that on May 14, 1987, she lived in Chicago with her husband, the deceased in this case. Defendant's mother, Zola Goodloe, lived next door. Diane had lived next door to defendant's family for $2^{1}/_{2}$ years and had seen defendant at his parents' house before. There was a fence that was not more than four feet high between the two houses.

Diane testified that she saw the deceased fighting with defendant on the afternoon of May 14, 1987, in front of the McKinney home. Defendant was a much larger and heavier man than the deceased, but the deceased was landing blows on defendant, who was swinging back, but missing. The men were also engaged in a verbal altercation. After observing the fight for a few minutes, Diane told her husband to come inside the house. At that point, the fight stopped, and she heard defendant say to the deceased, "I am going to kill you." Diane also heard defendant state, "I am going to kill you half white punk." The deceased then went inside his house. Thereafter, Diane got dressed and left the house about 4 or 5 p.m.. She later returned about 7 or 8 p.m.. When she returned, the deceased was at home with various relatives. After they all had gone to bed, three friends of the deceased came to the house at about 11 p.m. or 12 a.m. to celebrate a birthday. They stayed for about an hour or an hour and a half. When the visitors left, the deceased walked them to their car, which was parked in front of the house. They had gone out the back door because the front door of the house was nailed shut. During this time, Diane stayed on the back porch, which was enclosed with windows and doors.

Diane saw the deceased, after he had walked the visitors to their car, talking to defendant, who was standing on the McKinneys' side of the fence. Diane was a few feet from where they were standing and was close enough to hear some mumbling and cursing. As she turned to go into the house, Diane heard a shot and saw a flash coming from defendant. She then saw defendant throw something over the fence and jump over the fence. Defendant turned around,

and he and Diane made eye contact. She did not know if defendant ran into his home, because at that point, she started calling for her son, Eddie. She was screaming, "Red's been shot and Michael shot him."

When the police arrived, Diane told them that defendant shot her husband and told them this before they asked. When Diane pointed defendant out to the police, defendant was standing "[o]n the front part of his house like the side." The lighting was good, and she had a direct view.

Diane testified that she saw defendant shoot her husband with a gun, but she did not know the type of gun. She was not sure whether she had told the police that defendant jumped over the fence. Diane did not believe that she told the police that defendant ran eastbound down the street. She did recall telling the police that defendant ran to his house.

Diane further testified that she had previously seen the visitors who came to the McKinney home on the night of the shooting. She gave the visitors' names or nicknames to the police, and she did not see any cocaine. She told the police that she had one beer with her husband after 11 p.m. and had one other beer earlier in the day.

Latarra Moon, Diane's niece, testified that friends of the deceased and her aunt came to the house. Moon was staying at their house. She heard the visitors leave and her uncle say goodbye. After Moon heard the visitors' car pull away, she heard a gunshot. She then heard her aunt "hollering out for her son saying Red was dead. Red got shot." Moon told the police that she had not seen anything. The police did not ask her if she had heard anything. Moon also confirmed that she had never seen any cocaine in the house.

Officer Robert Stubitsch testified for the State that on May 15, 1987, he responded to a call that there had been a shooting. When he arrived at the scene at 2:07 a.m., a woman, later identified as Diane McKinney, ran up to him and told him that her husband had been shot. She gave him a description of the male shooter and within a few minutes told him the offender's name.

Stubitsch first secured the rear of the house and then went to the front where he observed a person fitting the description that Diane had given him, including the type of shirt and pants he was wearing. Stubitsch stated that as he walked towards the individual to question him, "Diane *** came running out from between the two houses, pointed at the individual and stated that was the man who had shot her husband." Stubitsch then arrested defendant at about 2:10 a.m..

Stubitsch testified that after speaking with Diane, he wrote in his

arrest report that the deceased had been shot with a handgun, but did not recall whether Diane told him this or whether she had indicated with her hand that the deceased had been shot. His report also stated that the offender fled eastbound. This conclusion was based on Diane's having pointed in an eastbound direction. Nowhere in his report did it state that the offender had jumped over a fence. Diane told him that the deceased had been drinking with defendant all day, but he could not recall whether Diane had participated. If Diane had told Stubitsch that she had been drinking all day, he would have put that information in his report. His report did not contain such information. He did not see any blood on defendant's clothes and did not see any bruises on defendant's body indicating that he had been in a struggle.

Officer John Butler testified for the State that he performed a gunshot residue test on defendant's hands at 4:15 a.m., the morning of the incident. He testified that upon being asked by him, defendant told Butler that he last washed his hands at 1 p.m. the previous day.

John Riley, a special agent with the Federal Bureau of Investigation, testified as an expert witness for the prosecution. He conducts gunshot residue analyses to determine whether a person may have discharged a firearm. He cannot, however, determine from said analyses the type of gun that was involved. Riley indicated that there are outside factors which affect the accuracy of his test, namely, the type of gun fired and the amount of time that has elapsed. He stated that some guns leave a deposit and others do not. Where a person who has discharged a gun has been active for about six or seven hours, an examination is not conducted since the contaminates will have been physically removed.

Riley performed gunshot residue examinations on the swabs taken from defendant's hands in order to determine whether the elements, antimony and barium, were present which would indicate that defendant had gunshot residue on his hands from a discharged firearm. Riley testified that when he tested the swabs taken from the palms and backs of both of defendant's hands, he found significant amounts of antimony and barium. Based on the swabbings that were taken from defendant, Riley's conclusion was that "defendant either discharged the firearm or he was in the environment of gunshot residue." When asked what he meant by "in the environment of gunshot residue," he explained that an individual "could have either been very close to somebody else shooting a gun or he could have been struggling with somebody when a gun went off and in some cases when a person merely handles a very dirty weapon." He also noted that the significant amounts of antimony and barium which were

found were much higher than typically found on the hands of non-shooters.

Detective Terrence O'Connor testified for the State that he was assigned to investigate the homicide. He stated that about 4 a.m. he spoke to Diane, who related that she saw something in the offender's hands. She told him that there was a flash, but could not describe the type of gun. Nevertheless, O'Connor wrote in his report that a handgun was the murder weapon because "Diane told [the police] that she saw the flash coming from the hand which would make it a handgun."

Detective O'Connor testified for the defense that he did not notice any bloodstains, burns or marks on defendant which would indicate that he had been fighting. O'Connor went inside defendant's home the evening of May 15, 1987. There he confiscated two handguns which were handed over by Orville Smith, defendant's brother-in-law, who lived in the Goodloe house. Smith said that the unregistered guns belonged to defendant. O'Connor did not recall Diane telling him that the shooter jumped over the fence after having thrown a gun over it. Although on direct examination he testified that Diane told him that the shooter ran eastbound, he explained on cross-examination that the testimony was an error on his part.

Officer Robert Stubitsch testified for the defense that after arresting defendant, he spoke with Moon. He stated that Moon's first statement was that she did not see or hear anything. Approximately 10 or 20 minutes later, however, she retracted the statement and said that she had heard one gunshot.

Officer John Butler testified for the defense that he saw defendant's hands at the police station and did not notice any burns on them. Following Butler's testimony, the defense rested. Following deliberations, the jury found defendant guilty of murder.

Defendant's trial counsel filed a timely motion for a new trial. Subsequently, defendant retained new counsel, who filed a supplemental post-trial motion for a new trial alleging the ineffectiveness of trial counsel. On April 10, 1990, a hearing was held on the question of trial counsel's competency. At the close of the hearing, new counsel informed the court that he would adopt the post-trial motion for a new trial previously filed by trial counsel.

The evidence presented at trial counsel's competency hearing addressed the alleged ineffective assistance of counsel charges. In addition to testifying on his own behalf, defendant presented several witnesses including trial counsel. The pertinent facts that were disclosed at that hearing are as follows.

Trial counsel testified that he had known defendant for years and

had handled other cases for him. He indicated that prior to trial, he reviewed the court file in this case. He was aware that George Greer, defendant's brother-in-law, allegedly shot and killed Diane's brother, and that the State had dismissed all charges against Greer. He reviewed all reports concerning People v. Greer that were tendered to him by the State, and he did not call Greer as a witness at trial.

Trial counsel further testified that he reviewed the police reports pertaining to the present case as well as the written statements given by three of defendant's family members who were at home at the time of the murder. He stated that he came to the opinion that no one could establish that defendant, who was staying at his mother's house, had been sleeping at the time of the shooting, and as a result, he had no intention of calling them as witnesses at trial. He therefore did not call those members of defendant's family who had given the statements to police, because he did not believe their testimony would have helped defendant's case. In fact, he stated that the three statements contained inconsistencies.

Trial counsel testified that he was aware that Diane had been arrested for intimidation, but knew the arrest was made after defendant's arrest for murder in this case. Consequently, he decided not to present evidence of the intimidation charge.

Trial counsel testified that defendant had admitted to having a fight with the deceased and that blows were thrown. Defendant did not tell him that the deceased had a fight with a person named Arnell Reliford. Trial counsel did not interview Reliford prior to trial.

Trial counsel testified that he did not subpoena the individuals who were at the McKinney home visiting just prior to his murder. Although he was told by defendant that members of the McKinney family engaged in the sale of illegal narcotics, rap sheets and police reports did not indicate any arrests for drug dealing. He believed that he discussed defendant's family members with him and asked if any of them had any information that was pertinent besides the three statements already given.

Trial counsel brought to the hearing his complete file relating to the case. The State noted that it received from the defense a stuffed file folder which was at least three inches thick as well as a full notebook stuffed with papers. Counsel testified that he had written notes including some names on the State's answer to discovery which had been tendered to him. Also, in the file was a copy of a subpoena issued by him for all oral and written statements from all witnesses and defendant, lab analysis reports, photos, inventory slips, street files, arrest reports and FBI records on Diane. He also testified as to having sent out other subpoenas to the medical examiner's office and to the toxicology department.

Arnell Reliford testified that he had been a friend of defendant's family for eight to nine years. Reliford indicated that he was not a friend of the deceased but knew who he was. On the afternoon of May 14, 1987, he was visiting defendant's brother at the Goodloe home. He stepped outside to talk with the deceased, who kept "bugging" them about cigarettes which he claimed Reliford owed him. After talking to the deceased, Reliford proceeded to walk home whereupon the deceased began pushing him. Reliford did not want to fight with him because he did not want to hurt him, but when the deceased "kept on," Reliford body slammed him a couple of times and went home. The deceased appeared to be intoxicated. Reliford had seen the deceased use drugs in May 1987, but could not say whether he sold drugs.

Faith Greer, defendant's sister, testified that her husband, George Greer, had been charged with killing Zachary Moon, Diane's brother. She stated that the deceased sold drugs on or about May 15, 1987, and that during the month, she saw him sell drugs several times.

Zola Goodloe, defendant's mother, testified that counsel never interviewed her prior to trial. Zola stated that after the trial, she told him that at about 2 a.m. on May 15, 1987, she saw defendant, who appeared to be asleep, lying on the couch in her living room. She did not attend defendant's trial because defendant told her that counsel "did not want [them] in the room."

Chari Goodloe Smith, defendant's sister, testified that at about 2 a.m. on May 15, 1987, defendant was sitting on the couch smoking a cigarette. She and her husband lived at her mother's house, and counsel did not interview her prior to trial. Chari did not go to her brother's trial because defendant "told [them] that *** his attorney asked that [they] not be present."

George Greer, defendant's brother-in-law, testified that he had been charged with the killing of Diane's brother, Zachary Moon, but that the State dropped the charges because he was found to have acted in self-defense. Counsel did not interview him prior to trial.

Defendant testified that counsel told him to tell his family to stay at home and not come to the trial. He told counsel about Reliford prior to trial. Specifically, he told counsel that Reliford was the person who had the fight with the deceased earlier that day. He never told counsel that he had a fight with the deceased. He told counsel that he and a next-door neighbor, Kevin Williams, had an argument with the deceased, but that it was Reliford who had the fight. Counsel did not tell him to bring Reliford in to see him until the night of the first day of trial. Defendant was unable to locate Reliford that night. He told counsel that he was asleep at the time of

the incident and asserted that he wanted to testify in his own defense, but counsel told him that he did not want him to testify. He gave him a reason, but defendant could not recall what it was.

Following testimony and argument, the trial court found that counsel acted reasonably in his representation of defendant. Consequently, the court denied defendant's motion for a new trial. The trial court subsequently denied defendant's motion for reconsideration. This motion was based on whether it was effective for trial counsel to fail to present the alibi defense available to defendant.

Defendant first contends that he was not proved guilty of first degree murder beyond a reasonable doubt and that his conviction was the product of Diane McKinney's purposeful misidentification of him as the man who shot and killed her husband.

The burden is on the prosecution to prove beyond a reasonable doubt the identity of the person who committed the offense. (Ill. Rev. Stat. 1989, ch. 38, par. 3—1.) The testimony of a single eyewitness is sufficient to support a conviction provided that the witness had the opportunity to view the accused under circumstances which would permit a positive identification. (*People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317.) The circumstances of observation, however, need not be perfect. (*People v. Gibson* (1990), 205 Ill. App. 3d 361, 562 N.E.2d 1142.) This is so provided that the witness' in-court identification is positive and credible. *People v. Slim*, 127 Ill. 2d 302, 537 N.E.2d 317.

It is the jury's prerogative to weigh testimony in light of its discrepancies and conflicts, to accept or reject as much or as little of a witness' testimony as it chooses, and to draw reasonable inferences therefrom. *People v. Woodard* (1992), 225 Ill. App. 3d 1069, 589 N.E.2d 924.

On review, a criminal conviction will not be set aside unless the evidence is so unsatisfactory, improbable or implausible that it creates a reasonable doubt as to defendant's guilt. (*People v. Slim*, 127 Ill. 2d 302, 537 N.E.2d 317.) When presented with a challenge to the sufficiency of the evidence, it is not the reviewing court's function to retry the defendant (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267), or to substitute its judgment for that of the trier of fact (*People v. Snulligan* (1990), 204 Ill. App. 3d 110, 561 N.E.2d 1125). Rather, the reviewing court must determine, after viewing all of the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 478 N.E.2d 267.

In the present case, Diane McKinney was a credible identification witness for the prosecution. She had a good opportunity to observe defendant during both incidents involving him and her

husband. In the afternoon, she observed the fist fight between the two men, after which she heard defendant say that he was going to kill her husband.

Later that evening, Diane stood on the back porch while the deceased accompanied his visitors to their car. She then saw defendant and her husband talking to each other in the McKinney backyard. She was only a few feet away from them and heard mumbling and cursing. As she turned to enter her house, she heard a gunshot and saw a flash coming from defendant. She then saw defendant throw something over the fence and jump over it. Defendant turned around, making eye contact with her. Diane also testified that the light was good. When the police arrived, she stated that defendant was the shooter. Her certainty of identification was enhanced by the fact that she had known defendant prior to the occurrence. Her testimony also received corroboration from that of the expert witness who stated that defendant had gunshot residue on his hands from a discharged weapon. Defendant was proved guilty of murder beyond a reasonable doubt.

Defendant next contends that the trial court erred when it did not allow him to introduce evidence that the deceased had alcohol in his body. He asserts that the court's refusal to allow him to substantiate Diane's drinking caused him severe prejudice and denied him a fair trial.

Prior to opening statements in the present case, the State made a motion *in limine* to prohibit defendant from referring to alcohol levels found in deceased's body. In response, defense counsel told the court that Diane, the State's key witness, would testify at trial that on the date of the incident, she was with the deceased all day and that they were drinking. Defense counsel asserted that evidence of the deceased's drinking would corroborate Diane's drinking and would form the basis of his contention that Diane's ability to observe the incident was impaired. The trial court denied the State's *in limine* motion, finding that if Diane testified that she was drinking with the deceased, the evidence that the defense sought to admit would be relevant for purposes of corroboration. Thereafter, based on the court's ruling, defense counsel referred in opening statement to the McKinneys' drinking and the unreasonableness of Diane's ability to have seen what she claimed she saw.

At trial, however, Diane testified that she was not with the deceased all day on the date of the incident, but that she left the house around 4 p.m. and returned around 7 or 8 p.m. On cross-examination, she stated that she may have told the police that she was at home all day drinking with the deceased. However, she believed that the police only asked her about the shooting.

At trial, defense counsel sought to admit the testimony of the medical examiner that alcohol and cocaine were found in the deceased's body. The State objected. The trial court then stated that because Diane testified that she was not at home for several hours on the date of the incident, the evidence was not relevant. It therefore ruled that defendant could not present evidence that the deceased had alcohol in his body at the time of his death. The court noted that Diane was impeached on the question of whether she left the house that day, but it found that such impeachment went only to her credibility.

Defendant now argues that Diane did testify that she may have told the police she was at home all day drinking with the deceased. He contends that based on section 115—10.1 of the Code of Criminal Procedure of 1963 (Code), Diane's statement to the police that she had been with the deceased all day drinking was not merely impeachment, but was substantive evidence. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.1.) He further argues that the evidence against him was not overwhelming and that the pivotal question for the jury was whether Diane should be believed.

■ We agree that section 115—10.1 allows for the substantive use of prior inconsistent statements. We also agree that Diane, as the declarant, had personal knowledge of the content of her out-of-court statement and admitted that she may have made the prior inconsistent statement allowing for its admissibility as substantive evidence pursuant to section 115—10.1. Nevertheless, we do not find that the trial court abused its discretion when it did not permit defendant to present such evidence. We find that it would be illogical to infer that Diane was drinking alcohol based on the blood-alcohol content of the deceased. This evidence would only go to show the deceased's condition at the time of his death which was not an issue at trial. Therefore, the evidence defendant sought to admit was irrelevant, and the trial court's decision to exclude it was neither unreasonable nor arbitrary. (*People v. Soler* (1992), 228 Ill. App. 3d 183, 592 N.E.2d 517.) Moreover, and most important is the fact that there is a dearth of evidence in the record showing that Diane was impaired in any way by alcohol at the time she witnessed the murder. Although understandably upset, she spoke to the police, told them what had occurred, gave a description of the shooter and identified defendant. There was no police testimony suggesting that she was impaired. Indeed, Stubitsch testified that Diane told him that her husband had been drinking, but offered no testimony that she appeared to have been drinking.

To support his position in this case, defendant cites *People v. Vil-*

*lalobos* (1977), 53 Ill. App. 3d 234, 368 N.E.2d 556, wherein this court held that evidence a witness had been drinking is relevant to the witness' capacity to observe. The *Villalobos* court reversed the defendant's murder conviction finding that the State had failed to prove him guilty beyond a reasonable doubt where its evidence rested upon the testimony of its key witness who testified that at the time he witnessed the killing he had consumed a large quantity of alcohol and was "feeling pretty good." (53 Ill. App. 3d at 239.) *Villalobos* is distinguishable from the case here since Diane testified on direct examination to only having had two beers approximately six to eight hours apart on the day prior to the incident. This could not be considered a large quantity of alcohol. While she admitted on cross-examination to having possibly told the police that she was at home with the deceased all day, it cannot be believed that she was drinking beer all day, particularly in light of the fact that there is no police testimony that Diane appeared to have been drinking when they arrived at the scene.

In his final contention, defendant asserts that the trial court erred when it denied his motion for a new trial alleging the ineffective assistance of trial counsel where his counsel failed: (a) to interview witnesses, including alibi witnesses, to support defendant's theory of misidentification; (b) to elicit the State's key witness' bias, interest and motive to testify falsely, by not examining the witness as to the killing of her brother by defendant's brother-in-law; (c) to impeach the State's key witness with an intimidation charge in which defendant was the complainant; (d) to present evidence promised to the jury in opening statements; and (e) to advise the court as to the substantive use of prior inconsistent statements and to tender a jury instruction on such statements.

■ In determining whether a defendant received ineffective assistance of counsel, a two-part test must be applied. First, defendant bears the burden of proving that counsel was deficient in that the performance of his attorney fell outside the " 'range of competence demanded of attorneys in criminal cases.' " (*People v. Flores* (1989), 128 Ill. 2d 66, 80, 538 N.E.2d 481, 485, quoting *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Fernandez* (1991), 222 Ill. App. 3d 80, 583 N.E.2d 627.) This is an objective test which uses a reasonableness standard. (*People v. Fernandez*, 222 Ill. App. 3d 80, 583 N.E.2d 627.) Second, the defendant must show that the attorney's failure prejudiced his defense such that he did not receive a fair trial. (*People v. Fernandez*, 222 Ill. App. 3d 80, 583 N.E.2d 627.) This standard is satisfied by demonstrating that there was a reasonable probability that "but for

counsel's unprofessional errors, the result of the proceedings would have been different." (*People v. Fernandez*, 222 Ill. App. 3d at 84, 583 N.E.2d at 630, citing *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) The competency of counsel is presumed and that presumption can only be overcome by strong and convincing proof. (*People v. Stewart* (1984), 101 Ill. 2d 470, 463 N.E.2d 677.) The issue of competency is determined by the totality of counsel's conduct. *People v. Stewart*, 101 Ill. 2d 470, 463 N.E.2d 677.

It has been held that a defense counsel's decision to call or not to call a certain witness at trial amounts to trial strategy and if counsel reasonably believed that the witness' testimony would have been unreliable or likely to have been harmful to the defense, counsel was not required to call that particular witness. (*People v. Flores*, 128 Ill. 2d 66, 538 N.E.2d 481.) Therefore, a claim of ineffective assistance of counsel is generally not supported by counsel's decisions involving trial strategy. *People v. Flores*, 128 Ill. 2d 66, 538 N.E.2d 481.

Defendant first argues that trial counsel's representation of him was deficient because he failed to interview certain witnesses, including alibi witnesses, who would have supported the defense theory of misidentification. More specifically, he asserts that several members of his family testified at the competency hearing that he was at home in the living room at the time of the shooting. In addition, defendant asserts that trial counsel also failed to interview Arnell Reliford prior to trial, despite the fact that counsel stated that he learned of Reliford from police reports. Reliford testified at the hearing that he was the one who had been fighting with the deceased on the afternoon preceding the murder.

A review of the record reveals that it was not necessary that trial counsel interview the prospective alibi witnesses since he knew what their potential testimony would be, based on their written statements to the police, and determined that an alibi defense would not help defendant.

■ Trial counsel is not obligated to perform a futile act (*People v. McNutt* (1986), 146 Ill. App. 3d 357, 496 N.E.2d 1089), and it is clear that interviewing the prospective alibi witnesses here would have been futile, where two of the witnesses, Zola and Chari, both testified at the competency hearing that had they been called to testify at trial, their testimony would have been exactly the same as their written statements. Presumably, Orville would have done the same. A review of the three statements along with the evidence presented

at trial confirms that counsel employed sound trial strategy in choosing not to pursue an alibi defense. The statements show that an alibi for defendant's whereabouts at the time of the shooting did not even exist. Defendant's position on the couch at the time he was seen by his family members was in close enough proximity to the murder scene next door to have allowed him time to kill the deceased, jump the fence, run into his mother's house and still be sitting or lying on the couch in the living room when his family members came downstairs after having been awakened by Diane's screams.

In addition to not helping defendant, the potential testimony of the suggested alibi witnesses may have harmed his case. One would have to wonder why defendant was calmly sitting or lying on the couch fully dressed when the rest of his family was awakened by Diane's screams. A reasonable inference would have been that defendant was dressed because he had just been outside and had no reason to investigate the commotion next door because he was the one who caused it. Moreover, both Zola's and Chari's statements corroborated Diane's testimony that she immediately identified defendant as the shooter, thus strengthening the State's case. Defendant therefore suffered no prejudice as a result of the alleged deficiencies. Clearly, counsel properly investigated a possible alibi defense, and his decision to avoid employing one was sound trial strategy.

■ We also find trial counsel's decision not to interview Reliford prior to trial to be reasonable. Counsel testified on direct examination at the competency hearing that defendant told him that he had a fight with the deceased on that afternoon. On cross-examination, counsel answered affirmatively when asked if defendant had an argument with the deceased that day. We do not view that answer to be a retreat from counsel's testimony that defendant admitted having a fight with the deceased. In view of that testimony and counsel's knowledge that defendant and the deceased had fought, accepted by the trial court, it was not necessary for him to interview Reliford.

Defendant next contends that he was denied effective assistance of counsel because his trial attorney did not elicit testimony from Diane regarding the killing of her brother, Zachary Moon, by defendant's brother-in-law, George Greer, which defendant claims provided her with a motive to testify falsely.

■ Counsel testified at his competency hearing that he reviewed the court file in People v. Greer as well as the related reports and was aware that the State had dropped the charges against Greer. Because the record reveals that he conducted this review, it is reasonable to infer that his decision not to elicit testimony from Diane regarding the fact that Greer killed Moon was a strategic one. While

delving into that issue at trial may have established a possible motive for Diane to fabricate, it would also have established a motive for defendant to have killed the deceased since it would have demonstrated a reason for the intense dislike between the families. It can be argued that defendant had a better chance of acquittal without a motive, and none had been established by the State, as to why the two men were fighting. We agree with the trial court's finding at the competency hearing that counsel's approach was the better trial tactic.

Likewise, it is far more believable that defendant would kill out of hatred than it would be to believe that Diane would purposely misidentify her husband's killer at the risk of letting the real killer go free. Furthermore, it is difficult to imagine that Diane would have had the time or the ability to fabricate the name of the shooter just minutes after witnessing her husband's murder. Counsel's decision not to question Diane about the Greer matter does not demonstrate ineffective assistance of counsel.

Defendant next claims that counsel's representation was ineffective because he did not know the critical fact of when defendant's intimidation charge against Diane had been filed, despite his having stated at trial that this indeed had occurred. More specifically, defendant contends that during trial, counsel told the court he had evidence that defendant had signed a complaint against Diane, prior to the shooting, charging intimidation. When counsel requested that the trial court issue a ruling allowing him to question Diane about the charge, the State asserted that the charge was "after the fact." Counsel responded that the charge was "before the fact," and that if Diane denied the charge, he would prove it up with certified transcripts. The trial court then stated that counsel could question Diane about the charge.

On cross-examination, counsel asked Diane: "Isn't it correct that prior to May 14, 1987, [defendant] had filed intimidation charges against you?" The trial court overruled the State's objection. Thereafter, counsel stated, "Just a second," and after a pause, asked Diane one unrelated question and did not pursue the line of questioning relating to the intimidation charge.

▇ The record reveals that at his competency hearing, counsel testified he discovered that the intimidation charge brought by defendant against Diane occurred after defendant was arrested in connection with the shooting death. Therefore, the charge could not have been used to establish motive or bias on the part of Diane with regard to her identifying defendant as the shooter. Furthermore, his decision not to continue questioning with regard to the intimidation

charge constituted a matter of trial strategy, since doing so could have harmed his overall defense by providing a motive to kill. Thus, it cannot be said that defendant suffered any prejudice even if counsel had conducted a greater investigation into the charges.

As another example of counsel's failure to adequately prepare for trial resulting in his ineffectiveness, defendant points to his remarks during opening statement that evidence of cocaine usage would be presented when, in fact, no such evidence was ever presented.

A review of the record shows that counsel made several good-faith attempts at trial to introduce evidence of the deceased's alleged cocaine use to which he had referred briefly in his opening statement when he said that there was "cocaine going on" at the midnight party at the McKinneys'. Each time, however, the trial court precluded him from doing so because it properly found that said evidence was not relevant to the issues in this case.

■ Since the admissibility of evidence is a matter within the sound discretion of the trial court and that determination may not be overturned on appeal absent a clear abuse of discretion, we do not find trial counsel's representation to have been ineffective where he made several good-faith attempts to introduce the evidence that he promised in his opening statement, and the trial court, in its discretion, properly kept it out, finding said evidence irrelevant. Defendant could not have been prejudiced by counsel's brief mention of the deceased's cocaine use in his opening statement.

Lastly, defendant asserts that trial counsel was ineffective due to his lack of knowledge concerning section 115—10.1. Specifically, he claims counsel failed to advise the court that Diane's prior inconsistent statement to police, that she had been at home all day with her husband drinking, could be introduced as substantive evidence, since Diane admitted making the out-of-court statement. (We note that Diane testified that she may have made such a statement to the police, but she believed that they asked her only about the murder.)

■ We have already stated that section 115—10.1 allows for the substantive use of a prior out-of-court inconsistent statement made by the declarant. However, we found that the trial court did not abuse its discretion in excluding such evidence. We found further that there was no evidence that Diane was impaired in any way by alcohol at the time she witnessed the shooting. Consequently, lack of knowledge on the part of counsel as to the effect of section 115—10.1 could not have been prejudicial to defendant (*Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052), and did not demonstrate ineffective assistance of counsel.

■ With regard to defendant's broad-based assertion that the

cumulative effect of trial counsel's deficient representation undermined the confidence in the outcome of his trial, such that he was prejudiced and was denied a fair trial, we note that the record shows, in looking at the totality of trial counsel's performance, that his conduct was well within the range of competence demanded of attorneys in criminal cases and that defendant, who was not prejudiced, received a fair trial.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and GIANNIS, J., concur.